FILED

DEC 0 7 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**HAROLD WILLIAM GUTCH**
pro se
Isarstrasse 66, 93057 Regensburg, Germany
tel. + 49–9403–573 or + 49–941–44 73 76

Plaintiff,

v.

CASE NUMBER   1:05CV02338

JUDGE: Ricardo M. Urbina

DECK TYPE: Pro se General Civil

DATE STAMP: 12/07/2005

Civil Action

**THE FEDERAL REPUBLIC OF GERMANY**
Embassy of the Federal Republic of Germany
4645 Reservoir Road, N.W.
Washington, D.C. 20007-1998, U.S.A.

Bundeskanzleramt        *German address in Germany.*
Willy-Brandt-Strasse 1
10557 Berlin, Germany

Defendant.

# COMPLAINT

# FOR ARBITRARY EXPROPRIETATION

## A. Preliminary Statements

1. This is a complaint for arbitrary expropriation by means of retroactive tax assessments including interest and default charges presented by the Berlin-Zehlendorf fiscal authorities totalling c. DM 3,400,000.- for the years 1957-1989 to plaintiff as the sole heir of his father against the estate of his father and the confiscation of his paternal inheritance of 2,300,000.- DM leaving the plaintiff at the age of 15 responsible for alleged further inheritance debts to defendants of 1,100,000.- DM - with the defendant's confirmation by the German courts and the European Court of Human Rights.

2. The tax assessments against the deceased are without any legal foundation for his status as

**Member of the Allied Forces of Berlin**

immunized him to German jurisdiction. Up to the reunification of Germany on 03 Oct 1990 West Berlin was not a constituent part of East or West Germany but was territory situated within East Germany and occupied by the Western Allies – as only as such it could be western and "free". According to international law the law the occupier enacts in occupied areas takes precedence over local law and in occupied Berlin occupation law took precedence over West German law which West Berlin had been permitted by the Allies to adopt in 1950. The fact that Allied law, that is occupation law preceded in Berlin has been confirmed by the jurisdiction of this court, see below nos 29 and 59. As Berlin occupation law provided for Members of the Allied Forces of Berlin to be immune to German jurisdiction the deceased was immune to German jurisdiction.

2

(Immunity to jurisdiction implies without further ado immunity to taxation, for even if the immune person had to pay taxes, offenses against it could not be pursued for his immunity to jurisdiction.)

3. He was not liable to German taxation for two reasons: There was no law in occupied Berlin to subject a Member of the Berlin Allied Forces to German/Berlin taxation (no law - no taxation, the law has to exist first). The Allies were in Berlin as an occupation power and were like any occupation power in any occupied area the supreme legislative and executive authority in Berlin. They would have had to pass the law subjecting them or their forces to German taxation themselves - which they did not (no occupation power in history has ever passed a law subjecting it to the taxation of the occupee). In addition to this they had enacted a law, Allied Kommandatura Law No 7, which like any occupation law in any occupied area preceeded local law inconsistent therewith, exempting in its Art. 1 and 2 Members of the Berlin Allied Forces and their possessions and in its Art. 3 any Allied legislation, regulation, directive, decision or order from German jurisdiction.

4. The same law provides in its Art. 4, 1: "All proceedings and every decision taken by a German Court on any matter excluded from its jurisdiction shall be null and void." The German retroactive tax assessments against the deceased and the judgments subjecting the deceased despite his capacity as a Member of the Berlin Allied Forces retroactively to German jurisdiction and taxation are decisions on "matter excluded from German jurisdiction" and are for that reason null and void. Allied Kommandatura Law No 7 is enclosed as enclosure 1. This law as all Berlin

Allied Kommandatura Laws is an inter-Allied law, that is the three Western Allies passed it in their joint capacity as occupation power of Berlin in all the three Western sectors of Berlin. As such it counts among the many international agreements of the United States concerning the occupation of Berlin which govern the present action and open the road for the jurisdiction of the United States district courts (28 U.S.C. § 1604 (FSIA), § 1331 (Federal Question Jurisdiction) and § 1350 (ATCA)).

**Enclosure 1: Allied Kommandatura Law No 7**

5. Concerned are the following decisions (the principal decision in this matter of each level are in emphasis, they are discussed in indicated nos and enclosed in indicated enclosure)

- **Decision of the European Court of Human Rights of 26 Oct 1999, application no 35530/97 (see below nos 143-145, photocopy in enclosure 60)**

- Decision of the Federal Fiscal Court of 15 Apr 1997/5580/96

- **Decision of the Federal Constitutional Court of 15 Aug 1996/2 BvR 456/95 (see below no 143, certified photocopy in enclosure 59)**

- Decision of the Berlin Fiscal Court of 12 Dec 1995/V1/94

- **Decision of the Federal Fiscal Court of 18 Oct 1994/I B 27/94 (see below nos 141-142, certified photocopy in enclosure 58)**

- **Decision of the Berlin Fiscal Court of 28 Sep 1993/V 355/87 and V 227/87 (see below nos 134-140, certified photocopy in enclosure 56)**

- Appeal decision of the revenue authority Berlin-Zehlendorf of 12 Dec 1995 plus the associated income-tax assessments for 1986 of 17 Mai 1989 and for 1987 and 1988 of 12 Oct 1989

- Appeal decision of the revenue authority Berlin-Zehlendorf of 15 Dec 1995 plus the associated income tax assements for 1989 of 13 Jun 1994

- Appeal decision of the revenue authority Berlin-Zehlendorf of 18 Sep 1987 plus the income tax assessments of 24 Jun 1986 for 1980, 1981, 1982, 1983 and 1984

- Appeal decision of the revenue authority Berlin-Zehlendorf of 18 Sep 1987 plus the associated property-tax assessments for 01 Jan 1958, 1959, 1960, 1962, 1963, 1964, 1968, 1969, 1971, 1972, 1974, 1975, 1977, 1980, 1983, each dated 24 Jun 1986

- Appeal decision of the inland-revenue authority Berlin-Zehlendorf of 10 Aug 1987 plus the income tax assessments for 1957, 1958, 1959, 1960, 1961, 1962,1963, 1964, 1965, 1966 and 1967, the income-tax assessments of 04 Jul 1986 for 1973, the income tax assessments of 24 Jun 1986 for 1974, 1975, 1975, 1976, 1977, 1978 and 1979, the surtax asessments 1974 of 24 Jun 1986 and the stability surtax assessment 1974 of 24 Jun 1986.

## B. Jurisdiction

6. The United States District Court of the District of Columbia has jurisdiction over plaintiff's claims under 28 U.S.C. §§ 1330, 1603 (a) and (b)(2), 1604, 1605 (a) (1), (3), (4), (5) (Foreign Sovereign Immunities Act), 28 U.S.C. § 1331 (Federal Question Jurisdiction), and 28 U.S.C. § 1350 (Alien Tort Claims Act).

### The Foreign Sovereign Immunities Act (FSIA).

7. The defendant, the Federal Republic of Germany (Germany), is a foreign state. Concerning foreign states 28 U.S.C. §1330 provides jurisdiction to district courts in nonjury civil actions "as to any claim for relief ... with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1604 provides "Subject to existing international agreements to which the United States

is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States except as …§ 1605 (a) in any case … (1) in which the foreign state has waived its immunity either explicitly or by implication."

8. First of all as the court decisions supra no 5 all apply the NATO Status of Forces Agreement, an international military agreement to which the United States is party, the case comes at any rate already for this fact alone under the exceptions of the FSIA – this point is further discussed below nos 25, 37, 38, 39. Second, as Berlin had from 1945 until 1990 occupation status, that is was occupied by the Allied Forces, there must, as occupied regions are never sovereign, necessarily exist the waiver of immunity of defendant/Germany concerning Berlin. Further, as the Three Western Allies jointly occupied West Berlin there must exist agreements among these Allies concerning the rules to be set in Berlin and the way to proceed there, that is international agreements governing this case.

9. The waiver of immunity of defendant/Germany with respect to place and time of the present action, Berlin from 1957 to 1989, that is a period during the occupation of Berlin which lasted from 1945 to 1990, is due to the defeat of defendant in World War II. Its unconditional surrender on 08 May 1945 is its explicit waiver of immunity. That is the Allies, to whom defendant had surrendered unconditionally, possessed the correspondent supreme sovereignty over defendant which means they set the rules in Germany. One of the rules the Allies set was that the Members of the Allied Forces (together with their property) and Allied decisions in Berlin were outside defendant's jurisdiction (see supra no 3 and 4 and Allied Kommandatura Law No 7 in enclosure

1, in particular Art, 1(b)(i)(ii) and 2(a) and 3,1 and 2). As for various reasons the Western Allies did not give up their rights concerning Berlin until 1990 (below nos 22, 23, 30; Precedents nos 57-63 and Historical Background nos 72-84), this unconditional surrender of defendant applied to Berlin until 1990. In short, the unconditional surrender of Germany of 8 May 1945 is defendant's waiver of immunity in this matter as demanded by 28 U.S.C. § 1605 (1).

10. This fact is still today recognized in the internet home page of the defendant's foreign office concerning the status of foreign forces in Germany. Its updated version of June 2005 reads: "Right of presence", "After the end of World War II, the presence of foreign armed forces in Germany was initially based on the law imposed by the occupying powers." The entry continues that in connection with the end of the occupation of the Federal Republic (West Germany) the Federal Republic became a party to the NATO and indicates that the NATO agreements including the Convention on the Presence of Foreign Forces in the Federal Republic of Germany which were signed then by the then Chancellor of the Federal Republic, for the fact that his authority only included the Federal Republic, still nowadays do not apply to the Laender of the former Democratic Replic and to Berlin, see below no 26. A photocopy of this internet entry is enclosed as enclosure 2.

**enclosure 2: Internet entry, Auswärtiges Amt, the status of foreign forces in Germany**

11. As according to international law the winner in an armed conflict obtains original rights over the defeated and as in World War II four Allies in a common effort defeated defendant, obtaining thereby joint original rights, which means the four of them had to agree on the diverse matters

7

concerning the occupation and ruling of defendant, there exist, beginning with the 'London Protocols' of September 1944 and ending with the 'Two Plus Four Settlement' of September 1990, a number of "applicable international agreements" (28 U.S.C. § 1330) or "existing international agreements to which the United States is a party" (28 U.S.C. § 1604) of the four wartime Allies which all govern the present action and under which the defendant is not entitled to immunity with regard to Berlin from 1945 to 1990: Because of the post-war development of the Iron Curtain running through Germany, separating it into two parts which were then incorporated into different world blocs, the Western Allies never gave up their original rights they had obtained over Berlin – an island in the Eastern bloc - until the collapse of the Soviet Union and the reunification of Germany. In short, concerning West Berlin the three Western Allies did not give up until 1990 the rights they obtained in 1945 by the unconditional surrender of defendant/Germany. As those original rights consisted of the "supreme authority" which the four Allies assumed on 05 June 1945 the sovereign in Berlin between 1945 and 1990 was not East or West Germany but the 'Four Powers', that is the four wartime Allies in their joint capacity as occupation organ. In the following there is first defendant's/Germany's 'waiver of sovereignty' in its unconditional surrender, see below no 12 and then there are, in their chronological order, beginning with the 'London Protocol of 12 September 1944' and ending with the 'Two Plus Four Settlement of 1990', a few of the wartime and post-war agreements and decisions of the Four Powers concerning Berlin, which are 'international agreements to which the United States was a party at the time of the enactment of the FSIA', evidencing Allied sovereignty and a corresponding lack of German or West German sovereignty for place, time and subject matter of the present action and ruling the present case as provided by 28 U.S.C. §§ 1330,

1604. This sovereignty being on a Four Power basis could not be altered or abolished by any one of the Four Powers. For the present case this means that the United States government cannot say that for reasons of state it does not want to insist in this particular case on the rights and responsibilities it possessed together with the other Allies in Berlin until 1990, it cannot take the position that Allied Kommandatura Law No 7, which the United States enacted as part of the Allied Kommandatura of Berlin, that is as part of the inter-Allied occupation government of Berlin, does, for reasons of state, not have to be applied here. The deceased was in Berlin in his capacity as Member of the Berlin Allied Forces and was as such part not only of the occupation measures of his government but part of the occupation measures of the Four Powers.

12. The '**German Act of Surrender, May 8, 1945**' in which defendant under no 1 "surrendered unconditionally" to "the Supreme Commander, Allied Expeditionary Force, and simultaneously to the Supreme High Command of the Red Army". The act was signed on behalf of the German High Command by Friedenburg, Keitel and Stumpf, in the presence of and on behalf of the Supreme Commander Allied Expeditionary Force A.W. Tedder, on behalf of the Supreme High Command of the Red Army, G. Zhukov, present witnesses F. de Lattre de Tassigny, General Commanding in Chief, First French Army and Carl Spaaz, General Commanding United States Strategic Air Forces." A photocopy of the German Act of Surrender taken from the book 'Selected Documents on Germany', p. 37 is enclosed as enclosure 3.

**Enclosure 3: German Act of Surrender**

13. The '**Protocol of 12 September 1944 of the Zones of Occupation in Germany and the Administration of "Greater Berlin"**' in which the United Kingdom of Great Britain and Northern Ireland, the United States of America, and the Union of Soviet Socialist Republics (the Government of the French Republic joined in later) "have reached the ... agreement" of how to occupy Germany after its unconditional surrender: "1. Germany, ... will, for the purposes of occupation, be divided into four zones, one of which will be allotted to each of the four Powers, and a special Berlin area, which will be under joint occupation by the four Powers." That is Germany was to be divided into five areas, four zones plus a special Berlin area. Concerning this special Berlin area the agreement states: " *Berlin Area (as shown on the annexed 4 sheets of map "B")*. The Berlin area ... will be jointly occupied by armed forces of the U.K., U.S.A., and U.S.S.R., assigned by the respective Commanders-in-Chief. For this purpose the territory of "Greater Berlin" will be divided into the following three parts." As to the sector which is designated to be that of the United States' we read: *"Southern part of "Greater Berlin"* (districts of Zehlendorf, Steglitz, Schöneberg, Kreuzberg, Tempelhof, Neukölln) will be occupied by the forces of the United States of America." (Italics in the original). Under no 5 the agreement states concerning the government of Berlin: "5. An Inter-Allied Governing Authority (Komendatura) consisting of four Commandants, appointed by their respective Commanders-in-Chief, will be established to direct jointly the administration of the "Greater Berlin" Area." A Photocopy of this agreement taken from the book Hendry and Wood, The Legal Status of Berlin, 1987, pp. 313-316 is enclosed as enclosure 4.

**Enclosure 4: Protocol of 12 September 1944 between the Governments of the U.K., the U.S.A, and the U.S.S.R., on the Zones of Occupation in Germany and the Administration of "Greater Berlin"**

14.  Concerning this authority governing Berlin, called later the 'Allied Kommandatura' (from the Russian 'Kommandatura' meaning 'government') a later agreement, the '**Tripartite Agreement of November 14, 1944 on Control Machinery in Germany**' specifies under Art. 7: "An Inter-Allied Governing Authority (Komendatura) consisting of three Commandants, one from each Power, appointed by their respective Commanders-in-Chief, will be established to direct jointly the administration of the "Greater Berlin" area. Each of the Commandants will serve in rotation, in the position of Chief Commandant, as head of the Inter-Allied Governing Authority." Photocopy of this agreement taken from the book 'Selected Documents on Germany, pp.31-33, is enclosed as enclosure 5.

**Enclosure 5: Tripartite Agreement of November 14, 1944 on Control Machinery in Germany**

15.  The '**Declaration Regarding the Defeat of Germany and the Assumption of Supreme Authority with Respect to Germany by the Governments of the United Kingdom, the United States of America, the Union of Soviet Socialist Republics, and the Provisional Government of the French Republic.**' of 05 June 1945. In this declaration the Allies assumed supreme authority: "The Governments of the United Kingdom, the United States of America and the Union of Soviet Socialist Republics, and the Provisional Government of the French Republic, hereby assume supreme authority with respect to Germany, including all the powers possessed by the German Government, the High Command and any state, municipal, or local government or authority. The assumption, for the purposes stated above, of the said authority and powers does not effect the annexation of Germany." A photocopy of the declaration taken from 'Selected Documents on Germany', pp. 38-42 is enclosed as enclosure 6.

**Enclosure 6: Declaration of June 05, 1945 on the Assumption of Supreme Authority by the Allies**

16.  The '<u>Allied Agreement on the Quadripartite Administration of Berlin</u>' of 07 July, 1945 in which it was stated under no 1 that the Inter-Allied Military Kommandatura was to be established "under a Chief Military Commandant ... whose orders and instructions ... must be obeyed in all zones of the City." Under no 2 it is stated:

"For the purpose of ensuring the supervision of Berlin ... a Headquarters of the Chief Military Commandant of Berlin consisting of Allied Representatives is to be established. In order to exercise the supervision and control of Berlin local government, ... representatives from each Allied Commandatura are to be attached to every section of the local government."

A photocopy of this agreement taken from "Selected Documents on Germany" p. 45 is enclosed as enclosure 7.

**Enclosure 7: Allied Agreement on the Quadripartite Administration of Berlin of 07/07/1945**

17.  The '<u>Kommandatura Letter regarding Statement of Principles for Berlin</u>' of 14 May, 1949. A Modification of this 'Statement of Principles' was passed on 8 March 1951.   A photocopy of the 'Statement' as well as of its Modification taken from the book 'Selected Documents on Germany' pp. 117-120 and 140-141 is enclosed as enclosure 8.

**Enclosure 8: Kommandatura Letter Regarding Statement of Principles for Berlin, 14 May 1949 and Modifications of 'Statement of Principles'**

18. The '<u>Statement by the Western Foreign Ministers on Allied Rights in Berlin, May 13,</u> <u>1950'</u>, in which the threeWestern Occupation Powers [without the Fourth Power, the Soviet Union] stated that they would "continue to uphold their rights in Berlin." A photocopy of the statement taken from 'Selected Documents on Germany', p. 129 is enclosed as enclosure 9.

**Enclosure 9: Statement by the Western Foreign Ministers on Allied Rights in Berlin of 13**

19. The '<u>Kommandatura Letter Approving Berlin Constitution of 1950', of 29 August 1950</u> in which the Allied Kommandatura (Berlin inter-Allied occupation government) stated in para (2) that it approved of the adoption of the West German Constitution by West Berlin, but that (2) (a) the powers vested in the city government by the Constitution were "subject to the provisions of the Statement of Principles which was promulgated on May 14, 1949, or any modification thereof" ('Statement of Principles' of 14 May 1949 and its modification see supra no 17 and enclosure 8), further (2) (b) that Article 1, para (2) and (3) were suspended, and (2) (c) "that during the transitional period [which was to last until 1990] Berlin shall possess none of the attributes of a twelfth Land" [in other words Berlin though being permitted to adopt the West German Constitution would not be part of West Germany [the Federal Republic]]. The photocopy of the 'Kommandatura Letter Approving the Berlin Constitution' taken from 'Selected Documents on Germany' pp. 135-136 is enclosed as enclosure 10.

**Enclosure 10: Kommandatura Letter of 29 Aug 1950 Approving Berlin Constitution**

20. The '<u>Tripartite Agreement on the Exercise of Retained Rights in Germany</u>', of 23 October 1954, in which the Three Powers stated under para (3): "Those rights which relate to

Berlin will continue to be exercised in Berlin pursuant to existing procedures, subject to any future modification which may be agreed." Photocopy of the agreement taken from 'Selected Documents on Germany' p. 209 is enclosed as enclosure 11.

**Enclosure 11: Tripartite Agreement on the Exercise of Retained Rights in Germany, 23 October 1954**

21. The '**Convention on Relations Between the Three Powers and the Federal Republic of Germany done at Bonn on 26 May 1952, as amended at Paris on 23 October 1954**', which came into effect on 05 May 1955, and in which the Western Allies terminated in Art. 1 the Occupation regime in the Federal Republic, but retained in Art. 2 "the rights and the responsibilities, heretofore exercised or held by them, relating to Berlin and to Germany as a whole, including the re-unification of Germany and a peace settlement" (our emphasis). A photocopy of the convention taken from the book, Henry and Wood, 'The Legal Status of Berlin', 1987, pp. 323-328 is enclosed as enclosure 12.

**Enclosure 12: Convention on Relations Between the Three Powers and the Federal Republic of Germany**

22. The '**Declaration on Berlin of 5 May 1955**' in which the Allied Kommandatura Berlin (inter-Allied Berlin occupation government, supra no 13, enclosure 4) permitted Berlin to "exercise all its rights, powers and responsibilities set forth in its Constitution ... subject only to the reservations made by the Allied Kommandatura on 29 August 1950 and to the provisions hereinafter". As to the reservations of 29 August 1950 see supra no 19 and enclosure 10. As to the "provisions hereinafter" of the Allied Kommandatura it specified the "fields" in which it retained power under all circumstances, which fields were

- Art. III (a) "Security, interests and immunities of the Allied Forces",

- Art. III (c) "Relations of Berlin with authorities abroad",

- Art. VI Allied legislation ("All legislation of the Allied authorities will remain in force until repealed, amended or deprived of effect"),

- Art. VII the precedence of Allied legislation in Berlin: "In case of inconsistency with Allied legislation, or with other measures of the Allied authorities, or with the rights of the Allied authorities under this Declaration, Berlin legislation will be subject to repeal or annulment by the Allied Kommandatura."

Though in these fields of power the Allies expressly retained power to themselves the defendant in the present case did not observe this and exercised power in exactly them: It violated retroactively the immunity of a deceased Allied Forces Member by subjecting him retroactively to its taxation and jurisdiction (infringement of the rights the Allied Kommandatura reserved to itself under Art. III (a) of this declaration). It declared in the pertinent judgments it would not observe Allied Kommandatura legislation (infringement of the rights the Allied Kommandatura reserved to it under Art. VI of this declaration). And finally the deceased was a U.S. Forces Member in Berlin that is a Berlin Allied Forces Member and therefore could not be judged like a U.S. civilian living in Berlin, therefore the judgments applied a NATO agreement to the case of the deceased, a military agreement in which West Germany obtained limited jurisdiction on a foreign forces member –which agreement was not valid in Berlin because of the status of Berlin (infringement of the rights the Allies reserved to themselves under Art. III (c) of this declaration). A photocopy of the declaration taken from Henry and Wood, The Legal Status of Berlin, 1987, pp. 332-334, is enclosed as enclosure 13.

**Enclosure 13: Declaration on Berlin**

23. The **'Quadripartite Agreement of 3 September 1971'**. The name shows already that this was an agreement between the Three Western Allies and the fourth Ally, the Sovjet Union. In this agreement the Allies "strove to promote the elimination of tension and the prevention of complication in the relevant area" (Part I, 1.). The "relevant area" is Berlin and the access routes to Berlin [which had to go through East Germany] and the "tensions" are the difficulties which had arisen in the past concerning Berlin because of the incorporation of the two German parts by their Allied occupiers into the two different world blocs, the East and the West, with the Iron Curtain dividing East Germany (German Democratic Republic) from West Germany (Federal Republic of Germany) and Berlin with its Western sectors being an island in East Germany, 150 miles behind the Iron Curtain and the city itself being divieded into a Western and Eastern part, with the iron curtain running through it. The Agreement deals in large part with certain practical matters which had given rise to difficulties in the past: The question of international meetings, exchanges or exhibitions in West Berlin to which the Soviet Ally had to consent (and until then had not consented) or the question of a Soviet embassy in West Berlin or of Soviet visas for entry into the Soviet Union for permanent residents of the Western Sectors of Berlin to which the Western Allies had to consent (and until then had not consented) etc. We quote the Quadripartite Agreement of 03 September 1971 verbatim in those parts referring expressly to the supreme authority or sovereignty of the Allies in Berlin based on their quadripartite rights and responsibilities (e.g. Quadripartite Agreement, Part II, B and also Annex II, 1: "the Western Sectors of Berlin ... continue not to be a constituent part of the Federal Republic of Germany and

not to be governed by it.") and to the lack of authority of West Germany with respect to the Western Sectors of Berlin (e.g. Annexe II, 2: "The Federal President, the Federal Government, the Bundesversammlung, the Bundesrat and the Bundestag, including their Committees and Fraktionen, as well as other state bodies of the Federal Republic of Germany will not perform in the Western Sectors of Berlin constitutional or official acts which contradict the provisions of paragraph 1." See also the interpretation of the term "state bodies" in the letter of the Three Ambassadors to the Chancellor of the Federal Republic: "The term "state bodies" in paragraph 2 of Annex II shall be interpreted to mean: the Federal President, the Federal Chancellor, the Federal Cabinet, the Federal Ministers and Ministries, and the branch offices of those Ministries, the Bundesrat and the Bundestag, and all Federal courts.")

Preamble to 'The Quadripartite Agreement of 3 September 1971':

"The Governments of the United Kingdom of Great Britain and Northern Ireland, the French Republic, the Union of Soviet Socialist Republics and the United States of America, ..."
Acting on the basis of their quadripartite rights and responsibilities, and of the corresponding wartime and post-war agreements and decisions of the Four Powers, which are not affected, Taking into account the existing situation in the relevant area [that is the Iron Curtain dividing East from West Germany and East from West Berlin],

Guided by the desire to contribute to practical improvements of the situation,

Without prejudice to their legal positions,

Have agreed on the following:

Part I, **General provisions**

....

2.  The four Governments, taking into account their obligation under the Charter of the United Nations, agree that there shall be no use or threat of force in the area and that disputes shall be settled solely by peaceful means.

3.  The Four Governments will mutually respect their individual and joint rights and responsibilities, which remain unchanged.

4.  The four Governments agree that, irrespective of the differences in legal views, the situation which has developed in the area, and as it is defined in this Agreement as well as in the other agreements referred to in this Agreement, shall not be changed unilaterally.

Part II, **Provisions relating to the Western Sectors of Berlin**

...

B. The Governments of the French Republic, the United Kingdom and the United States of America declare that the ties between the Western Sectors of Berlin and the Federal Republic of Germany will be maintained and developed, taking into account that these Sectors continue not to be a constituent part of the Federal Republic of Germany and not to be governed by it.

Detailed arrangements concerning the relationship between the Western Sectors of Berlin and the Federal Republic of Germany are set forth in Annex II.

....

D. Representation abroad of the interest of the Western Sectors of Berlin and consular activities of the Union of Soviet Socialist Republics in the Western Sectors of Berlin can be exercised as set forth in Annex IV.

Annex II, **Communication from the Governments of the French Republic, the United Kingdom and the United States of America to the Government of the Union of Soviet Socialist Republics**

The Governments of the French Republic, the United Kingdom and the United States of America, with reference to Part IIB of the Quadripartite Agreement of this date and after consultation with the Government of the Federal Republic of Germany, have the honor to inform the Government of the Union of Soviet Socialist Republics that:

1. They declare, in the exercise of their rights and responsibilities, that the ties between the Western Sectors of Berlin and the Federal Republic of Germany will be maintained and developed, taking into account that these Sectors continue not to be a constituent part of the Federal Republic of Germany and not to be governed by it. The provisions of the Basic Law of the Federal Republic of Germany and of the Constitution operative in the Western Sectors of Berlin which contradict the above have been suspended and continue not to be in effect.

2. The Federal President, the Federal Government, the Bundesversammlung, the Bundesrat and the Bundestag, including their Committees and Fraktionen, as well as other state bodies of the Federal Republic of Germany will not perform in the Western Sectors of Berlin constitutional or official acts which contradict the provisions of paragraph 1.

3. The Government of the Federal Republic of Germany will be represented in the Western Sectors of Berlin to the authorities of the three Governments [the three Allies] and to the Senate by a permanent liaison agency.

ANNEX IV A, **Communication from the Governments of the French Republic, the United Kingdom and the United States of America to the Government of the Union of Soviet Socialist Republics**

The Governments of the French Republic, the United Kingdom and the United States of America, with reference to Part IID of the Quadripartite Agreement of this date and after consultation with the Government of the Federal Republic of Germany, have the honor to inform the Government of the Union of Soviet Socialist Republics that:

1. The Governments of the French Republic, the United Kingdom and the United States of America maintain their rights and responsibilities relating to the representation abroad of the interests of the Western Sectors of Berlin and their permanent residents, including those rights and responsibilities concerning matters of security and status, both in international organizations and in relations with other countries.

2. Without prejudice to the above and provided that matters of security and status are not affected, they have agreed that:

(a) The Federal Republic of Germany may perform consular services for permanent residents of the Western Sectors of Berlin.

(b) In accordance with established procedures, international agreements and arrangements entered into by the Federal Republic of Germany may be extended to the Western Sector of Berlin provided that the extension of such agreements and arrangements is specified in each case.

(c) The Federal Republic may represent the interests of the Western Sectors of Berlin in international organizations and international conferences.

(d) Permanent residents of the Western Sectors of Berlin may participate jointly with participants from the Federal Republic of Germany in international exchanges and exhibitions. Meetings of international organizations and international conferences as well as exhibitions with international participation may be held in the Western Sectors of Berlin.

3. The three Governments authorize the establishment of a Consulate-General of the USSR in the Western Sectors of Berlin accredited to the appropriate authorities of the three Governments in accordance with the usual procedures applied in those Sectors for the purpose of performing consular services [West Germany could not authorize the establishment of a Consulate-General of the USSR for West Berlin].

[ANNEX IV] B, **Communication from the Government of the Union of Soviet Socialist Republics to the Governments of the French Republic, the United Kingdom and the United States of America**

The Government of the Union of Soviet Socialist Republics, with reference to Part IID of the Quadripartite Agreement of this date and to the communication of the Governments of the French Republic, the United Kingdom and the United States of America with regard to the representation abroad of the interests of the Western Sectors of Berlin and their permanent residents, has the

honor to inform the Governments of the French Republic, the United Kingdom and the United States of America that:

1. The Government of the Union of Soviet Socialist Republics takes note of the fact that the three Governments maintain their rights and responsibilities relating to the representation abroad of the interests of the Western Sectors of Berlin and their permanent residents, including those rights and responsibilities concerning matters of security and status, both in international organizations and in relation with other countries.

2. Provided that matters of security and status are not affected, for its part it will raise no objection to:

(a) the performance by the Federal Republic of Germany of consular services for permanent residents of the Western Sectors of Berlin;

(b) in accordance with established procedures, the extension to the Western Sectors of Berlin of international agreements and arrangements entered into by the Federal Republic of Germany provided that the extension of such agreements and arrangements is specified in each case;

(c) the representation of the interests of the Western Sectors of Berlin by the Federal Republic of Germany in international organizations and international conferences;

(d) the participation jointly with participants from the Federal Republic of Germany of permanent residents of the Western Sectors of Berlin in international exchanges and exhibitions, or the holding in those Sectors of meetings of international organizations and international conferences as well as exhibitions with international participation, ...

3. The Government of the Union of Soviet Socialist Republics takes note of the fact that the three Governments have given their consent to the establishment of a Consulate-General of the USSR in the Western Sectors of Berlin....

AGREED MINUTE I

It is understood that permanent residents of the Western Sectors of Berlin shall, in order to receive at appropriate Soviet offices visas for entry into the Union of Soviet Socialist Republics, present:

a passport stamped "Issued in accordance with the Quadripartite Agreement of 3 September 1971"

..........

*The Ambassadors of the French Republic, the United Kingdom and the United States to the Chancellor of the Federal Republic of Germany*

*September 3, 1971*

[In this letter the Ambassadors of the French Republic, the United Kingdom and the United States to the Chancellor of the Federal Republic of Germany clarify and interpret certain points of the Quadripartite Agreement. This letter runs in part as follows:]

"With reference to the Quadripartite Agreement signed on September 3, 1971, our Governments wish by this letter to inform the Government of the Federal Republic of Germany of the following clarifications and interpretations of the statements contained in Annex II, which was the subject of consultation with the Government of the Federal Republic of Germany during the quadripartite negotiations.

These clarifications and interpretations represent the understanding of our Governments of this part of the Quadripartite Agreement, as follows:

(a) The phrase in paragraph 2 of Annex II of the Quadripartite Agreement which reads: "… will not perform in the Western Sectors of Berlin constitutional or official acts which contradict the provisions of paragraph 1" shall be interpreted to mean acts in exercise of direct state authority over the Western Sectors of Berlin.

(b) Meetings of the Bundesversammlung will not take place and plenary sessions of the Bundesrat and the Bundestag will continue not to take place in the Western Sectors of Berlin…

….

(e) The term "state bodies" in paragraph 2 of Annex II shall be interpreted to mean the Federal President, the Federal Chancellor, the Federal Cabinet, the Federal Ministers and Ministries, and the branch offices of those Ministries, the Bundesrat and the Bundestag, **and all Federal courts.** (our emphasis)

……

*The Ambassadors of the French Republic, the United Kingdom and the United States to the Chancellor of the Federal Republic of Germany*

*September 3, 1971.*

….

We have the honor by means of this letter to convey to the Government of the Federal Republic of Germany the text of the Quadripartite Agreement signed this day in Berlin. The Quadripartite Agreement was concluded by the Four Powers in the exercise of their rights and responsibilities with respect to Berlin.

We note that, pursuant to the terms of the Agreement and of the Final Quadripartite Protocol which ultimately will bring it into force, the text of which has been agreed, these rights and responsibilities are not affected and remain unchanged. **Our Governments will continue, as heretofore, to exercise supreme authority in the Western Sectors of Berlin, within the framework of the Four Power responsibility which we share for Berlin as a whole.** (our emphasis)

....

Part II(B) and (D) and Annexes II and IV of the Quadripartite Agreement relate to the relationship between the Western Sectors of Berlin and the Federal Republic. In this connection, the following are recalled *inter alia*:

the communications of the three Western Military Governors to the Parliamentary Council of 02 March, 22 April and 12 May, 1949,

the letter of the three High Commissioners to the Federal Chancellor concerning the exercise of the reserved Allied rights relating to Berlin of 26 May, 1952 in the version of the letter X of 23 October, 1954,

the *Aide Mémoire* of the three Governments of 18 April, 1967 concerning the decision of the Federal Constitutional Court of 20 January, 1966 in the Niekisch case.

Our Governments take this occasion to state, in exercise of the rights and responsibilities relating to Berlin, which they retained in Article 2 of the Convention on Relations between the Three Powers and the Federal Republic of Germany of 26 May, 1952 as amended October 23, 1954, that Part II (B) and (D) and Annexes II and IV of the Quadripartite Agreement concerning the

relationship between the Federal Republic of Germany and the Western Sectors of Berlin accord with the position in the above-mentioned documents, which remains unchanged.

With regard to the existing ties between the Federal Republic and the Western Sectors of Berlin, it is the firm intention of our Governments that, as stated in Part II(B)(1) of the Quadripartite Agreement, these ties will be maintained and developed in accordance with the letter from the three High Commissioners to the Federal Chancellor on the exercise of the reserved rights relating to Berlin of 26 May, 1952, in the version of letter X of October 23, 1954, and with pertinent decisions of the Allied Kommandatura of Berlin.

*The Chancellor of the Federal Republic to Her Majesty's Ambassador at Bonn:*

*Bonn,*

*September 3, 1971.*

....

I have the honor to confirm receipt of the letter of the Ambassadors of France, the United Kingdom and the United States of America of September 3 together with which the text of the Quadripartite Agreement signed on September 3, 1971, in Berlin was communicated to the Government of the Federal Republic of Germany.

I also have the honor to confirm receipt of the letter of the three Ambassadors of the same date containing clarifications and interpretations which reflect what their Governments understand by the declarations contained in Annex II to the Quadripartite Agreements with regard to the relationship between the Federal Republic of Germany and the Western Sectors of Berlin.

.....

The Government of the Federal Republic of Germany has taken note of the contents of Your Excellency's letter which were communicated to it in exercising the rights and responsibilities which were retained in pursuance of Article 2 of the Convention on Relations between the Federal Republic of Germany and the Three Powers of May 26, 1952, as amended on October 23, 1954, and which will continue to be respected by the Government of the Federal Republic of Germany.

.....

## FINAL QUADRIPARTITE PROTOCOL

The Governments of the United Kingdom of Great Britain and Northern Ireland, the French Republic, the Union of Soviet Socialist Republics and the United States of America,

Having in mind Part III of the Quadripartite Agreement of 3 September 1971 and taking note with satisfaction of the fact that the agreements and arrangements mentioned below have been concluded,

Have agreed on the following:

1. The four Governments, by virtue of this Protocol, bring into force the Quadripartite Agreement, which, like this Protocol, does not affect quadripartite agreements or decisions previously concluded or reached.

.....

4. In the event of a difficulty in the application of the Quadripartite Agreement or any of the above-mentioned agreements or arrangements which any of the four Governments considers serious, or in the event of non-implementation of any part thereof, that Government will have the right to draw the attention of the other three Governments to the provisions of the Quadripartite

Agreement and this Protocol and to conduct the requisite quadripartite consultation in order to ensure the observance of the commitments undertaken and to bring the situation into conformity with the Quadripartite Agreements and this Protocol.

.......

A Photocopy of the Quadripartite Agreement of 3 September 1971 is enclosed as enclosure 14.

**Enclosure 14: Quadripartite Agreement of 3 September 1971**

24. The **'Two Plus Four Settlement'** or the **'Treaty of 12 September 1990 on the Final Settlement with Respect to Germany'** in which the Allies consented to the reunification of East and West Germany by stating in Article 7 of this settlement: "1. The French Republic, the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland and the United States of America hereby terminate their rights and responsibilities relating to Berlin and to Germany as a whole. As a result, the corresponding quadripartite agreements, decisions and practices are terminated and all related Four Power institutions are dissolved." The settlement excludes in its Article 5 "alliance structures to which German armed forces in the rest of German territory are assigned [NATO being the one the Federal Republic was assigned to and the Warsaw Pact the other the Democratic Republic was assigned to]", from Berlin, until "the completion of the withdrawal of the Soviet armed forces from the territory of the present German Democratic Republic and of Berlin,... "which completion was only achieved in September 1994 Photocopy of the Two Plus Four Settlement is enclosed as enclosure 15.

**Enclosure 15: Two Plus Four Settlement**

25. The '**NATO Status of Forces Agreement, Art. X**', an international military agreement to which the United States has been a party since NATO came into existence in 1951 which therefore governs the FSIA when it is applied (28 U.S.C. § 1604). In this agreement the NATO Parties agree on the conditions on which they can station their forces in each other's area of sovereignty. This agreement was not valid in occupied Berlin because of the status of the city, which being an island in the Eastern bloc had to remain occupied by the Western Allies in order to remain "western and free" until the reunification of Germany. The presence of the Allies in Berlin was by their original rights as occupation power and not by virtue of a military agreement with West (let alone East) Germany. The then West German Chancellor Konrad Adenauer had signed the NATO Pact and within it the NATO Status of Forces Agreement in 1952 and 1954 when West Germany was permitted to rearm again but the authority he possessed comprehended only West Germany and not West Berlin. The NATO Pact West Germany signed excluded automatically West Berlin as this city was not a constituent part of West Germany (supra no 23, Quadripartite Agreement, Annex II, 1 "...the Western Sectors of Berlin continue not to be a constituent part of the Federal Republic of Germany [West Germany] and not to be governed by it") and no West German authority including the Chancellor had constitutional power in West Berlin (supra no 23 Quadripartite Agreement, Annex II, 2. "The Federal President, the Federal Government, the Bundesversammlung, the Bundesrat and the Bundestag, including their Committees and Fraktionen, as well as other state bodies of the Federal Republic of Germany will not perform in the Western Sectors of Berlin constitutional or official acts"). Take note, too, of the answer of the Chancellor of West Germany confirming the receipt of the Quadripartite Agreement of 1971 and the attached letter of the three Ambassadors quoted supra no 23 ["The

Government of the Federal Republic of Germany has taken note of the contents of Your Excellency's letter which were communicated to it in exercising the rights and responsibilities which were retained in pursuance of Article 2 of the Convention on Relations between the Federal Republic of Germany and the Three Powers of May 26, 1952, as amended on October 23, 1954, and which will continue to be respected by the Government of the Federal Republic of Germany"]. In particular there was no West German authority concerning the Berlin Allied Forces (see supra no 22, Declaration on Berlin, Art. III (a), enclosure 13). NATO and with it the NATO Status of Forces Agreement was even explicitly banned from Berlin for a considerable period after reunification, as in the 'Two Plus Four Settlement', Art. 5, the two German states and the four Allies agreed: "1. Until the completion of the withdrawal of the Soviet armed forces from the territory of the present German Democratic Republic and of Berlin,... only German territorial defense units which are not integrated into the alliance structures to which German armed forces in the rest of German territory are assigned will be stationed in that territory as armed forces of the united Germany... 3. Following the completion of the withdrawal of the Soviet armed forces from the territory of the present German Democratic Republic and of Berlin, units of German armed forces assigned to military structures in the same way as those in the rest of German territory may also be stationed in that part of Germany, ..." As this "completion of the withdrawal of the Soviet armed forces from the territory of Berlin" was only accomplished by the end of September 1994, the decision of the Berlin Fiscal Court of 28 Sep 1993/V 355/87 drawing on the NATO Status of Forces Agreement was given at a time when the Agreement was explicitly banned from Berlin and the ruling of the German Federal Fiscal Court of 18 Oct 1994/ V 355/87 was given just a few days after its banning from the city of Berlin had ended. As these

judgments draw on the NATO Status of Forces Agreement, Art. X, though it was not valid in Berlin until 1990, and was explicitly banned from Berlin in the Two Plus Four Settlement from 1990 until 1994 and has not been valid there until today (see below no 26), the defendants by applying it come within the exception of the FSIA (28 U.S.C. § 1604 "subject to existing international agreements") and would deprive themselves of their sovereign immunity and provide for the jurisdiction of the United States had they not anyway had no sovereignty in this matter (because of its waiver of immunity, supra no 12 and because of other international treaties governing the action, supra no 13-23). The NATO Status of Forces Agreement (Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces) as it is published in the internet is enclosed with title page and page 11 (page containing Art. X) as enclosure 16.

**Enclosure 16: The NATO Status of Forces Agreement, pp 1 and 11 (with Art. X)**

26. Until today foreign forces have not been able to be stationed in Berlin on the basis of the NATO status of Forces Agreement. Referred is to the statement of defendant in the home page of its Foreign Office on foreign forces in Germany, supra no 10, enclosed in enclosure 2. It states "Right of presence.... On October 1954, the Convention on the Presence of Foreign Forces [of which the NATO Status of Forces Agreement is part] in the Federal Republic of Germany ... between Germany and eight partners ... created a treaty basis for the presence of forces stationed in Germany. ... In principle it still does not apply to Berlin, Brandenburg, Mecklenburg-Western Pomerania, Saxony, Saxony-Anhalt and Thuringia (the former GDR). However an Exchange of Notes (of 25 September 1990, see Federal Law Gazette 1990 II p. 1251, Federal Law Gazette

1994 II p. 29, and 12 September 1994, see Federal Law Gazette 1994 II p. 3714) granted the armed forces of Belgium, Canada, France, the Netherlands, the United Kingdom and the United States of America the right of temporary presence in these new Bundesländer, including the reunified Berlin, if the German authorities consent." Therefore even today the Berlin finance court could not draw back on the NATO Status of Forces Agreement if it had to judge upon the taxability of a foreign forces member in Berlin but would have to draw back on the corresponding Exchange of Notes.

27. A list of the principal treaties and other international instruments up to 1986 to which the United States is a party relating to occupied Berlin is contained in Hendry and Wood, 'The Legal Status of Berlin', (1987), pp. 357-361, a photocopy of which list is enclosed as enclosure 17.

**Enclosure 17: Principal treaties and other international instruments concerning Berlin**

28. All Allied legislation in Berlin is based on the Quadripartite or Tripartite Agreement, all Allied Kommandatura Laws and orders, which apply to alle three sectors but also all laws passed by only one of the Sector Commandants in his individual sector, for his individual power is derived from joint power and rests on joint agreement. Therefore Allied laws in Berlin are also 'international agreements' governing the FSIA. Enclosed as enclosure 18 is a photocopy of a table of Allied legislative measures in Berlin as contained in Hendry and Wood, 'The Legal Status of Berlin', pp 362-370. [The abbreviations in section (v) Allied Kommandatura Berlin mean: BK/O: Berlin Kommandatura Order; BK/L: Berlin Kommandatura Letter, the number in brackets designates the year; the number after the bracket is the number of the letter or order in

the particular year, followed by the page reference in the book, 'The Legal Status of Berlin'. Accordingly BK/O (55)10 means Berlin Kommandatura Order, 1955, 10th Berlin Command order of that year (1955)]. This list confines itself to only the most important laws. A comprehensive list of the occupation legislation is the book by Dieter Schröder, 'Das Besatzungsrecht in Berlin', 1990 ['The Occupation Legislation of Berlin']. Enclosed are further 2 photocopies, one is p IX of the first, the other p XXI of the second volume of "Verordnungsblatt der Stadt Berlin 1989" [Berlin Law Gazette 1989], which pages being part of the indexe of each volume show that alone for the year 1989 the Allied Kommandatura Berlin passed altogether 15 laws, nine between 15 Dec 1988 and 22 Jun 1989 and six between 31 Mai and 30 Nov 1989, which laws were binding for the whole of West Berlin and the Commandant of the British Sector one law on 31 Mai 1989 which law was binding for only the British Sector.

**Enclosure 18: Table of Allied legislative measures in Berlin; photocopies of pp IX and XXI of indexes of "Verordnungsblatt der Stadt Berlin 1989, Vol I and II".**

29. The waiver of the sovereign immunity of defendant with regard to occupied West Berlin has been confirmed by the jurisdiction of the United States: The United States Court of Appeals for the District of Columbia Circuit affirmed in 1979 in 'Dostal, et al. v. Vance', Civil Action No. 79-1964 a ruling of the U.S. District Court of Washington, D.C., confirming the US occupation authorities' supreme authority in Berlin. It ruled that the US Force in West Berlin was "practically sole sovereign" in the American sector of West Berlin, - excluding thereby West or East Germany as sovereign with respect to the Berlin American sector. This ruling states: "While it is clear the U.S. Government has not annexed the American sector of West Berlin, and also, that the war with Nazi Germany has been officially over since 1951, the position of the U.S.

Force in West Berlin is in many respects that of an occupying force. It is practically "sole sovereign" in its sector, and exercises "supreme authority", local government and institutions and courts being but its creatures." (quoted from the book "Judgment in Berlin", Postscript, see enclosure 19; the enclosure contains also the description of the case, pp.340-342 of the book). Allied supreme authority in occupied Berlin with supreme US authority in the American sector of the city is also confirmed by the United States court for Berlin in the judgment 'United States v. Hans Detlef Alexander Tiede and Ingrid Ruske, 86 F.R.D. 227 (March 14, 1979). The judgment is published in the internet under address "Allied Kommandatura Law No 7". See also 'Dostal v. Haig, 652 F.2d 173 (D.C.Cir. 1981)' on the status of Berlin under US occupation: "We have consulted and made use of Judge Stern's scholarly account of the origin, history, and present status of the U.S. occupation of Berlin" (note: not US presence in Berlin but "US occupation of Berlin", quoted from 'Judgment in Berlin' by H. Stern, postscript).

**Enclosure 19: Judgment in Berlin, postscript**

30. That West Germany had no sovereignty with regard to West Berlin was the attitude of the executive branch of the United States from 1945 to 1990. This attitude is reflected in the Memorandum of the Department of State to the United States Judge for Berlin of March 1979 quoted in the book 'Judgment in Berlin' (1984) by Judge Herbert J. Stern, page 94 (enclosure 20), which reads in part like this: "A. THE UNITED STATES' AUTHORITY IN BERLIN UNDER INTERNATIONAL LAW IS DERIVED FROM THE RIGHTS OF CONQUEST UNDER THE LAW OF WAR ... As has been noted throughout the Memorandum, Berlin is an occupied city. It is not United States territory. The United States presence there grows out of

conquest, not the consent of the governed... The basic point is this: a defendant tried in the United States Court for Berlin is afforded certain rights found in the Constitution, but he receives these rights not by force of the Constitution itself ... but because the Secretary of State has made the determination that these certain rights should be provided.... Throughout their history all United States Occupation Courts in Germany, including the United States Court for Berlin, have been *instruments* of the occupation policy of the United States ... (italics: emphasis of H.J. Stern).

**Enclosure 20:  Judgment in Berlin, p. 94**


31. 28 U.S.C. §1605 (a) (3) (4) and (5) provide for a foreign state not to be immune from the jurisdiction of United States courts in any case in which "(3) rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state;" and in any case "(4) in which rights in property in the United States acquired by succession or gift ... are in issue" and in any case  "(5) in which money damages are sought against a foreign state for ... damage or loss of property, occurring in the United States and caused by the tortuous act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." These provisions are met with the defendant's tax assessments against the deceased including assessments against his income on US stock and with US stock being among the items confiscated by defendant. Refer to enclosure 21, the photocopy of the list of US stock of the deceased which defendant seized in 1985 and still keeps in the Stadtsparkasse der Stadt Berlin, the municipally owned bank

of Berlin. Defendant would have sold them already at the time of seizure that is 20 years ago if

the deceased had not withstood the pressure of defendant to supply his signature for this action

and after his death his heir has refused his, too, despite of defendant's very strong pressure in this

respect. These stocks are "in issue" as demanded by 28 U.S.C. § 1605 (a) (3)(4) and they consist

of shares in American enterprises ("property in the United States"). The money invested in them

by the plaintiff's deceased father is constantly "working" in the United States, which is the

"regular course of commercial conduct" of 28 U.S.C. 1603(d). As for the last 20 years the stock

has been in possession of defendant the "commercial activity carried on in the United States by

the foreign state" of 28 U.S.C. § 1605 (a) (2) is given, as it will be given when defendant sells the

stock for this would fulfill the "particular commercial transaction or act" of 28 U.S.C. 1603(d).

The provision of 28 U.S.C. 1605 (a) (3) is also met as "rights in property in the United States

acquired by succession" are in issue. 28 U.S.C. § 1605 (a) (5) is met as the seizure of the

American stock constitutes for the plaintiff "damage or loss of property occurring in the United

States caused by the tortuous act of that foreign state ..."

**Enclosure 21: certified photocopy of list of US stock in the name of the plaintiff's deceased father Samuel L. Kobre, seized and deposited by the Finanzamt Berlin Zehlendorf in the Stadtsparkasse Berlin.**

32. 28 U.S.C. § 1605 (a)(2)(3) and (4) apply not only to the US stock of the deceased that

defendants confiscated but to his whole estate, which consisted of bank assets which though

being present at his death in Berlin must be regarded as "property present in the United States"

because of the deceased's status as Member of the United States Berlin Allied Forces. Generally

a US forces member's stay abroad in his capacity as such a forces member is not regarded as stay

outside the United States, he is for example under the protection of the Constitution as much as

he is at home. The deceased was staying in Berlin because he had been admitted as an attorney for occupation law and matters in Berlin by the United States government, in which capacity he had been granted the status of Member of the Berlin Allied Forces. As such a Forces Member his stay in Berlin – like that in particular of all the other Allied Forces Members in Berlin or in general that of US forces members abroad (not only in Berlin) or that of members of the US diplomatic corps abroad – cannot be regarded as a stay abroad. Accordingly the deceased's whole estate which was only present in Berlin in connection with his being there as an Allied Forces Member can be designated as 'property present in the United States' which triggers 28 U.S.C. § 1605 (a)(3)(4) and (5). This concerns also the 1,100,000 DM that the defendants worked out the deceased still owed to them, consisting of interest for thirty years for the allegedly withdrawn taxes. In short, what defendant seized already of the deceased's estate and what it still claims from him is because of his status as Allied Forces Member "property present in the United States". Property of the Allied Forces was under the special protection of Allied Kommandatura Law No 7, Art. 1 (b), that is the Allies recognized it as "their own".

33. The present case deals with court decisions of 1992 and later, a period after Germany's reunification in 1990, when defendant was sole sovereign over its internal and external affairs. The question to be answered therefore is whether defendant's present immunity as sovereign applies to the present action which deals with defendant subjecting in 1992 a Member of the US Allied Forces of Berlin to its jurisdiction retroactively for the years 1957-1989. First of all even if defendant could claim immunity in the present case it gave it up when applying the NATO Status of Forces Agreement, Art. X, to the case, an international agreement to which the United States

was party at the time of the enactment of the FSIA, for the application of "any applicable international agreement" brings the case into the realm of 28 U.S.C. § 1330 under which US district courts jurisdiction is given. Secondly, defendant possesses no immunity in the matter anyway as no retroactive Four Power authority for the period between 1945 and 1990 such as jurisdiction over the former Allied Forces was transferred to them in the 'Two Plus Four Settlement'. Such jurisdiction over the former Berlin Allied Forces or one particular member of them would imply a retroactive change of the former legal status of Berlin and the official abolition of occupation legislation for one particular case, the present case, and the consent of the Four Allies would have been necessary for it, as they exercised their authority in Berlin jointly. Their joint authority is seen in the the law that defendants violated here and also expressly negated by drawing on the NATO Status of Forces Agreement instead, which law is not called 'US Berlin occupation law No 7' but 'Allied Kommandatura Law No 7', and not observing it in a retroactive case where it had to be observed means violation of the sovereignty of the Allied Kommandatura. To violate retroactively the immunity of a US Berlin Allied Forces Member means primarily to violate the immunity of that particular person, further the authority of the United States in the American sector in Berlin and finally the occupation Powers' joint authority in fields which they had specified as exclusively their own in the 'Declaration on Berlin of 5 May 1955' and in which they were sole sovereign in Berlin from 1945 to 1990, (as to the Declaration on Berlin of 5 May 1955 see supra no 22, enclosure 13, see also the confirmation of the capacity of the Allied Force in Berlin as sole sovereign in the American sector of Berlin by the United States Court of Appeals for the District of Columbia Circuit, supra no 29, 'Dostal, et al. v. Vance', Civil Action No. 79-1964, see also enclosure 19)). As the sovereign immunity that

defendant possesses today does not include retroactive jurisdiction over the former Berlin Allied Forces defendant cannot claim sovereign immunity with regard to the present action.

The Federal Question Jurisdiction

34. 28 U.S.C. §1331 provides: "The district courts shall have original jurisdiction in all civil actions arising under the Constitution, laws, or treaties of the United States". The present action fulfills two of the conditions under which this law applies: it arose under the Constitution and also under a treaty of the United States:

35. It arose under the Constitution as it arose in the American sector in Berlin during occupation times, for which the United States Court for Berlin decided in the judgment United States, as the United States Element, Allied Kommandatura, Berlin, v. Hans Detlef Alexander Tiede and Ingrid Ruske, defendants, Criminal Case No 78-001; Criminal Case No 18-001A, 86 F.R.D.227, 1979 U.S. Dist. LEXIS 13805, March 14 1979, that the Constitution applied to it as it was under American 'protective occupation' (which began in 1951 with the official end of the state of 'belligerent occupation'). The judgment arrives on page 42 (internet version) at the following statement: "Therefore, this Court believes that these defendants should be afforded the same constitutional rights that the United States would have to afford its own nationals when brought before this Court." The deceased and his estate were entitled to the protection of the United States Constitution to a higher degree than provided for by this precedent: The deceased was not a German accused of a criminal action but a US Berlin Allied Forces member with a special

immunity status granted by the government of the United States. His stay in Berlin cannot be considered as a period of residence in a foreign country, he was in Berlin within the constitutional rights the United States affords its nationals as much as in the United States (cf the formulation of judgment 'United States v. Tiede' quoted above: "this Court believes that these defendants should be afforded the same constitutional rights that the United States would have to afford its own nationals when brought before this Court." ["**this** Court" that is the United States court **in Berlin**])

36. The United States Court of Appeals agreed in 'Dostal v. Haig, 652 F.2d 173 (D.C.Cir.1981)' with Judge Stern's application of the Bill of Rights to Berlin in the judgment United States v. Tiede: "We note further that Judge Stern (sitting as the United States Judge for Berlin by appointment of the Ambassador), held that he was bound by the U.S. Constitution's Bill of Rights to require a jury trial in the case of the German airplane hijackers then before the court. *United States v. Hans Detlef Alexander Tiede and Ingrid Ruske, 86 F.R.D. 227 (March 14, 1979)...* We have consulted and made use of Judge Stern's scholarly account of the origin, history, and present status of the U.S. occupation of Berlin. We accept, *arguendo,* his attractive position that the Bill of Rights is fully applicable to govern the conduct of U.S. judges and officials in Berlin, respecting friendly foreign nationals,..."(quoted from 'Judgment in Berlin' by H. Stern, Notes, p. 381-382).

37. It arose under a treaty of the United States as it arose under all the Four Power agreements on Berlin referred to supra nos 13-24, all of which it violates. It arose in particular under a treaty of

the United States as the judgment of the Berlin fiscal court rejecting the plaintiff's challenges against the retroactive assessments of his late father, judgment file ref Kobre/Heir v. Finanzamt Zehlendorf V355/87 of 28 September 1993, drew upon the legal basis of the NATO Status of Forces Agreement. This agreement, to which the United States is party, was signed by the Federal Republic in 1954 when it was permitted to rearm again. In this agreement the receiving state obtains in a narrow field taxation sovereignty over the members of a foreign NATO force stationed in its area of sovereignty, who were accordingly not completely immune in this respect, unlike the completely immune Berlin Allied Forces Members. The agreement did not extend to Berlin – that is it was not valid there at all - because the Allies did not give up their rights concerning Berlin which they had obtained in 1945 until 1990 (supra no. 21: Convention on Relations between the 3 Powers and the Federal Republic, Art. 2; supra no 22: Declaration on Berlin of 5/5/55; no 23: Quadripartite Agreement of 1971). They gave them up in 1990 in the Two Plus Four Settlement when they declared in Art. 7, 1 that they hereby terminated their rights and responsibilities relating to Berlin and to Germany as a whole, supra no 24 (Art. 7, 1 and 2 quoted verbatim), the agreement is enclosed as enclosure 15. Berlin therefore was until 1990 under Allied occupation and the Allies with their forces were in Berlin not by consent of or agreement with the Democratic or the Federal Republic but on their joint Four Power sovereignty as occupation authority and power (see supra no 22,  enclosure 12: 'Declaration on Berlin', § III (a) "Security, interests and immunities of the Allied Forces" stated as the primary fields in which the Allied authorities would exercise power; see further supra no 29: US District Court, Washington, D.C., decision 'Dostal, et al. v. Vance', Civil Action No. 79-1964 declaring US force as "sole sovereign" and "supreme authority" in the US sector in Berlin; see also supra no

30). The Allied Forces in West Berlin were not here as NATO-troops, as part of a western defense unit (NATO) but with the higher status of the Victorious Powers of World War II (possessing as such supreme sovereignty in Berlin due to the unconditional surrender of Germany in June 1945). Up to the present day this NATO agreement has never applied to Berlin: From 1945 to 1990 the status of Berlin excluded the agreement from Berlin and the Allied Forces were there on their own sovereignty as occupation power, from 1990 to 1994 the Two Plus Four Settlement in its Art. V, 1 excluded NATO from Berlin "until the last Soviet troops had left Berlin" which was accomplished by September 1994, and since then as the NATO Status of Forces Agreement did even then not automatically apply to those parts of Germany which were not included in the treaty when it was signed in 1954, which parts were the former GDR and Berlin, foreign forces can be stationed in Berlin only by virtue of special Letters between Germany and the NATO parties, see statement of German Foreign Office in enclosure 2 ("[NATO Pact] ...still does not apply to Berlin... including the reunified Berlin"). Therefore since 1994 only German forces have been stationed in Berlin to whom though being part of the NATO the NATO Status of Forces Agreement does not apply, as in this agreement the NATO parties agree on the conditions on which foreign NATO troops can be stationed in a NATO party's area of sovereignty. It goes without saying that Germany does not need to draw on an agreement with its "NATO party Germany" in order to station its own forces in Berlin. In Berlin they are not foreign but 'at home'. In short, the German court applied an agreement to a region from which it was automatically excluded by its nature up to the present day, which is misuse or violation of the treaty - but which triggers Federal Question jurisdiction.

38. Even if the NATO Status of Forces Agreement had been applicable to the Allied Forces in Berlin – which was not the case – the violation of a treaty of the United States triggering federal question jurisdiction would still be given in the present case as defendant transgresses the express limits with respect to the taxation of the foreign NATO forces set in this agreement to the receiving state. Article X of the NATO Status of Forces Agreement, the article on which defendant in Berlin fiscal court judgment file ref V 355/87 drew back in order to gain jurisdiction, provides in paragraph 1:

"Where the legal incidence of any form of taxation in the receiving State depends upon residence or domicile, periods during which a member of a force or civilian component is in the territory of that State by reason solely of his being a member of such force or civilian component shall not be considered as periods of residence therein, or as creating a change of residence or domicile, for the purposes of such taxation. Members of a force or civilian component shall be exempt from taxation in the receiving State on the salary and emoluments paid to them as such members by the sending State or on any tangible movable property the presence of which in the receiving State is due solely to their temporary presence there." In the present case defendant subjected the deceased to its taxation with <u>all</u> his income of the preceding 32 years (1957-1989), though his income in his capacity as a forces member, that is his income as attorney for occupation purposes, would have been exempt from the taxation of the receiving state under the NATO Status of Forces Agreement and if "tangible movable property" includes stock, because stock though being investment in enterprises which are 'immovables', stock documents, like bank documents like bank assets are 'tangible' and 'movable' property, then all his income on stock would have been, too. The assessing of the whole income of the deceased would violate the

NATO Status of Forces Agreement in its Article X even had it been valid in Berlin, that is federal question jurisdiction would be given even then.

39. The NATO Status of Forces Agreement would have been violated in a further respect. Article X of the Agreement reads in its paragraph 2: "Nothing in this Article shall prevent taxation of a member of a force or civilian component with respect to any profitable enterprise, other than his employment as such member, in which he may engage in the receiving State, and, except as regards his salary and emoluments and the tangible movable property referred to in paragraph 1, nothing in this Article shall prevent taxation to which, even if regarded as having his residence or domicile outside the territory of the receiving State, such a member is liable under the law of that State." Under the assessment regulations of the Federal Republic of Germany, Abgabenordnung AO 1977 §169, and of reunited Germany, retroactive assessment can be carried out for only five years, everything prior to that being statute-barred, under very narrow and special circumstances [which are not present here] it can be carried out for ten years retroactively, but there is no possibility whatsoever to go legally beyond that. To assess the deceased retroactively for over 30 years would, even if the NATO Status of Forces Agreement had applied to the case, be excessive and wrongfully collected assessment, which not being provided for "under the law of that State" would not be domestic and violate Art. X of the NATO Status of Forces Agreement and accordingly a treaty of the Unites States.

The Alien Tort Claims Act

40. 28 U.S.C. §1350, provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The present action is a tort committed in violation of the law of nations and in violation of a treaty of the United States.

41. The law of nations is violated because occupation law – which ranks as international law or law of nations - is violated by being rejected in favor of a non-valid military agreement. This was done for the purpose of stripping the deceased of his immunity, for the immunity of the Berlin Allied Forces Members was protected by Berlin occupation law, the already mentioned Allied Kommandatura Law No 7, Art.1 and 2. The law that an occupier enacts in an occupied territory is valid law of that region with precedence over any other local law (cf supra no 22, Declaration on Berlin, Art. VI and VII ) and this has been at all times the custom and usage of civilized nations. Occupation law is international law or the law of nations as it defines among others the relationship between the victorious power and the defeated nation and it ranks among international customary law. See Supra no 30 and the formulation of the Department of State in its Memorandum to the United States Judge for Berlin of March 1979 "A. THE UNITED STATES' AUTHORITY IN BERLIN UNDER INTERNATIONAL LAW IS DERIVED FROM THE RIGHTS OF CONQUEST UNDER THE LAW OF WAR.". Occupation law as international customary law is the complement of international agreements and both belong to the realm 'general use and practice of nations'. 'Violation of occupation legislation' is not identified

by Sosa v. Alvarez-Machain (03-339) 331 F. 3d 604, reversed, as an offense triggering the ATCA for the reason that violation of occupation legislation occurs during the occupation and is therefore taken care of by the occupier himself. Retroactive violation of it by the authorities of the former occupee never happened in history before the present case. But the retroactive violation of occupation legislation means necessarily retroactive violation of the law of nations which triggers the ATCA.

42. Sosa v. Alvarez-Machain (03-339) 331 F. 3d 604, reversed, recognizes 'infringement of the rights of ambassadors' as one of the offenses triggering the ATCA. The immunity of Members of the Allied Forces in Berlin equals that of diplomats, in fact the staff of the US Mission, Berlin [read: 'US Berlin occupation government'], consisting of members of the US diplomatic corps, was officially "Members of the Allied Forces." (cf. enclosure 33: Allied Kommandatura Law No 2, Art. I(3)(a)). The difference between the immunity of occupation and diplomatic staff lies in the fact that occupation immunity is one of the occupier's original rights due to the surrender of a defeated adversary whereas diplomatic immunity is based on agreement. As in the present case Germany retroactively violated the immunity of a Berlin Allied Forces Member the ATCA is triggered.

43. A treaty of the United States is violated as defendant fills the legal void - which was there as on the one hand the deceased was not a civilian who would have been automatically within the jurisdiction of defendant and on the other hand because occupation legislation according to which Allied Forces Members were immune to defendant's jurisdiction was rejected - by drawing on

the NATO Status of Forces Agreement, an agreement not valid in occupied Berlin (supra nos. 25-26; 37-39), which agreement was therefore misused or violated as defendant did not respect the limits of the treaty. Drawing back on it defendasnt recognizes that the deceased was a foreign forces member (and not just an American civilian living in Berlin as which he would have been within defendant's jurisdiction without further ado) - only in Berlin he was a US Berlin Allied Forces Member and not a US Forces Member stationed in West Germany.

Plaintiff's nationality

44.  Plaintiff was born on 3 Jan 1977 in Regensburg, Germany. Plaintiff is the son of Dr. Ulrike F. Gutch, a German citizen, and Dr. Samuel Kobre, an American citizen. Plaintiff is German by birth and fulfills the condition for the pursuit of a claim under the ATCA of being alien. A copy of an original of the German birth certificate is enclosed as enclosure 22.

**Enclosure 22: original of plaintiff's German birth certificate**

45. When plaintiff was established in 1991 as sole heir of the late Dr. Samuel L. Kobre, he was registered only as a German. From the very beginning of the action against the Berlin Zehlendorf revenue authorities which his late father had filed before his death and which he resumed he turned at various times with letters and telephone calls to the US embassy for assistance in the matter. He applied for his US citizenship on the advice of legal adviser to the US embassy Jessica Holmes, as according to her the embassy could only help him with his claim against Germany if

he was a US citizen. He was established a US citizen on 24 May 1994 retroactively to his birth. Photocopy of the consular certificate of his birth abroad is enclosed as enclosure 23. Since his establishment as a US citizen until the filing of the present suit in the district court in Washington, D.C., his US citizenship has been inactive as he lives in Germany. He did not even visit the US during this time. His first visit to the US since his becoming a citizen of the US is the filing of this suit as according to his information this has to be done personally. Having filed it he will immediately return to Germany as his center of life is in Germany and he knows nobody in the United States.

**Enclosure 23:  Photocopy of plaintiff's US consular report of birth abroad, 24 May 1994**

46. The plaintiff has until today been turned down by the US embassy with respect to his claim for assistance. Though the embassy is evasive on the reason for this it can only be on the ground that the plaintiff is not entitled to diplomatic assistance by the US due to the inactivity of his US citizenship – for the reason of his German citizenship being active as long as he lives in Germany.

C. Venue

47. 28 U.S.C. Section 1391 (f)(4) provides: "A civil action against a foreign state as defined in section 1603(a) of this title may be brought in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." This

action is brought against a foreign state and therefore this action is within the jurisdiction of the United States District Court for the District of Columbia.

48. Concerning the courts to which the present claim could be transferred if this court should find it time-barred under its rules there is the provision of 28 U.S.C. § 1391 (f)(1) under which a civil action against a foreign state may be brought "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated". The permanent home address of the deceased was with his sister Mrs. Sadie Sacks, 965 Park Terrace, Union, New Jersey and after her death in the early 1960s with his other sister Mrs. Tilly Kobrin, 23 Geraud Ave., Plainfield, New Jersey, who died a few weeks after Dr. Kobre. The events giving rise to the claim can therefore be said to have occurred in New Jersey which means the district court of New Jersey could also be regarded as a venue. Further all the district courts have venue of the districts where defendant Germany has an embassy or a consulate as this meets the provisions of 28 U.S.C. § 1391 (f)(3) ("in any judicial district in which the agency or instrumentality [of the corresponding State] is licensed to do business or is doing business"). Germany must 'do business' wherever it has an embassy or a consulate, as it has to buy or rent an embassy or consulate building, has to accommodate its officials with houses or flats which it has to rent or buy and for which it has to enter into contracts concerning heating, water, garbage removal etc., it has to hire local personnel, its officials buy food or goods etc. Besides its embassy in Washington, D.C. Germany has Consulates General in Atlanta, Ga., Boston, Ma., Chicago, Ill., Houston, Tex., Los Angeles, Ca., Miami, Fl., New York, N.Y., and San Francisco. Germany is further 'doing business' in all the

cities in which there is a branch of any enterprise of which Germany owns shares. For example it is the owner of 40% of the shares of the enterprise 'Telecom' of which the official telephone directory of New York names five branches alone in New York. Further as the defendants seized American stock of the deceased as described supra no 31, see list of stock in enclosure 21, the defendants do business with the respective enterprises and the district courts of the location of these enterprises also are a venue for the present action. The list of stock in enclosure 21 names stock of Ford (address: Ford, c/o EquiServ Trust Comp, N.A., Post Office  Box 8553, Edison, New Jersey 08818-8553), American Information Technologies Corporation (Chicago, Illinois), Bell Atlantic Corp. (Philadelphia, PA), BellSouth (Atlanta, GA), Ninex (New York, N.Y.), Pacific Telesis Group (San Francisco, Ca.), Southwestern Bell Corp. (St. Louis, Miss.) and US West Inc. (Denver, Col.).


## D. Limitation Period


49.  ATCA has a limitation period of ten years beginning with the decision of the last possible home remedy. Before the home remedies are not exhausted the matter is still in dispute. Only with a negative decision for the plaintiff of the last possible home court the violation of plaintiff's rights is accomplished. The decision of the last possible home court in this action is the European Convention of Human Rights' decision of 26 Oct 1999 (application no 35530/97). This action is therefore within this limitation period.

50. Time-barring is excluded in the light of Allied Kommandatura Law No 7 which rules the present case. First, the law's provision under its Art. 4,1 quoted supra no 4 (enclosed in enclosure 1) renders all German decisions "on any matter excluded from its jurisdiction ... null and void". Therefore whenever this law applies to a German decision this decision is (shall be!) null and void the very minute it is given and necessarily remains so regardless of any lapse of time. Inherent in this law rendering decisions null and void must automatically be the right of the victim to get the corresponding decision declared null and void or to establish the rights violated by the decision which is by law null and void – and that regardless of a possible lapse of time, for otherwise the law would not function in every case in which it is supposed to work. Secondly Allied Kommandatura Law No 7 specially provides in its Art. 9 concerning a time limit: "In every case, both criminal and non-criminal, the period during which the German Courts have been deprived of jurisdiction by reason of the provisions of any legislation of the occupation Authorities or of any Authority to which they have succeeded shall not be included in calculating any legal time limit." As the present case has from its beginning until today been a case outside German jurisdiction, and that by reason firstly of Allied Kommandatura Law No 7, Art. 2 (a)(b)(c), Art. 3, (1) and (2) and Art. 8 and after this law had expired by reason secondly of the Two Plus Four Treaty which did not transfer a pertinent jurisdiction onto the Germans, and as until today German Courts have been deprived of the jurisdiction in this case by the provisions of the legislation of the occupation Authorities, therefore "the period during which the German Courts have been deprived of jurisdiction" has lasted until today, and the period from the beginning of the case until today must not "be included in calculating any legal time limit".

51. If the court should find that the limitation period has elapsed the plaintiff asks the court to take into consideration that the lapse of time cannot be blamed on plaintiff or to transfer his claim to a court which would not consider the claim time-barred (as to courts to which it could be transferred, see supra no 48). The lapse of time cannot blamed on the plaintiff for this reason: The plaintiff was established as heir in September 1991. In the name of the then minor plaintiff his mother resumed in 1992 the pending litigation which the deceased had already filed before his death by challenging defendant's retroactive tax assessments against him. The plaintiff's mother turned to the US embassy for assistance in the matter as soon as she resumed the action but was advised in 1992 (Dec) and again after the decision of the Berlin fiscal court in September 1993 in telephone calls to US embassy legal adviser Jessica Holmes to try the complete German legal avenue first before trying US diplomatic paths and was promised the United States diplomats would help if this avenue should fail. Since this route has been terminated all her approaches to the US embassy in Germany for assistance have been turned down, the last letter from the embassy in this respect dates from 20 May 1998 and expresses the opinion that it could not and would not help. The oral advice of the US embassy in 1993, after the judgment of the Berlin fiscal court, to continue the German legal avenue was in fact only the disguised advice to get any corresponding claim against the US authorities statute-barred. The about 20 US attorneys to whom she turned in the past since 1990 have not even answered her letters or e-mail, the only answers that she ever received from the law firms that she contacted were her turning downs by A. Ristau in 2003, Randolph Schoenberg in 2004 and Hall, David and Joseph in 2004. The plaintiff only found out about ATCA in June 2004, when it was mentioned in the German media because of the latest decision in the matter Sosa v. Alvarez-Machain. It was only then that he

became aware of this possibility to complain in the United States in a civil action for a tort committed in violation of the law of nations or a treaty of the United States. Until then he had been ignorant of essential information to pursue his claim.

## E. Tort and Damages Remedy

### Tort

52. The past and present tort consists in assessing the deceased despite his immunity as a Berlin Allied Forces Member retroactively to 1957 and in the confiscating of the plaintiff's inheritance from the deceased who was his father. The assessments and the refuting of the plaintiff's challenge of the assessments by the Berlin fiscal court of September 1993 (file ref no V 355/8), the rejection of the plaintiff's application for appeal to the higher courts, the rejection of the Federal fiscal court of 14 September 1994 (file ref no IB 28/94), the German Constitutional Court (ruling of 15 August 1996 [file ref no 2 BvR 456/95]), and the ruling of the European Commission on Human Rights (26 Oct 1999 [application no 35530/97]) infringe the plaintiff's rights of peaceful enjoyment of his inheritance (of his possessions), of being only assessed subject to the conditions provided for by law and by the general principles of international law, of equality before the law: concerning the deceased all the other members of the Berlin Allied Forces could enjoy the privileges of their status and were never taxed by Berlin, in particular not retroactively after the occupation and since history began this is the only documented case in

which an occupee stripped a member of the occupier's forces of his possessions – concerning the heir this is the only case in American and German history where the heir of an immune person was not only robbed by his state of his heiritage but also inflicted with alleged further debts in the million.These rights are secured by the European Convention of Human Rights (Art. 6,1; Art. 7; Art. 14 and Art. 1 of protocol no 1), the German Basic Law (Art. 3; Art. 14, 1 and 3; Art. 19), and the American Constitution (Bill of Rights, Amendment IV, V and VII) which applies to the present case as the United States Court for Berlin decided in 1979 in United States v. Tiede that the American Constitution applied to the American sector in Berlin, the United Nations International Covenant on Civil and Political Rights (Art. 2 (3,2); Art. 3; Art. 14; Art. 17 and Art. 26).

53. The future tort consists in lifelong distrainment on the plaintiff's income: As the Berlin Zehlendorf finance authorities worked out that with the interest for thirty years back the deceased allegedly owed them at the time of his death over a million Deutschmark more than they had already pocketed and as the heir is responsible for this sum the plaintiff will be distrained to subsistence level (800 € per month) the minute he begins working. He possesses his university degree as a mathematician ("Diplommathematiker") and has been offered twice already an employment as assistant professor [Assistent] by the Department of Mathematics at the University of Regensburg which offers he had to turn down for it makes no sense for him to engage in such an otherwise very interesting and challenging profession as the greater part of his income would be confiscated every month by the defendant - apart of the shame he would feel because of the distrainment and the bad reputation that would go with it. Most likely he would be

dismissed as soon as the university got knowledge of his debts and after such a dismissal it would be fairly unlikely to find employment with the government or the state at all. There is no use in trying to find employment in the free economy for what well-established firm would hire someone with such debts and how can one ever be self-employed with such a financial background? The assessments and the judgments therefore in addition to the above-mentioned torts infringe the plaintiff's rights of self-determination, of free pursuit of his economic, social and cultural development, free choice of work, his rights to protection against interference with his privacy, family, home or correspondence, or unlawful attacks on his honor and reputation, his right to protection against excessive fines or unusual punishment. Such rights are secured by the laws of every democracy in the whole world, for example by the German Basic Law, Art. 2 and Art. 12, the European Convention on Human Rights, Art. 8, the Bill of Rights, Amendment VIII, the United Nations International Covenant on Civil and Political Rights, Art. 1 and 17. This enumeration ca not be comprehensive.

54. The tort consists further in the threatening and intimidating attitude that the defendant has taken against plaintiff since he became of age and the attacks on his honor and reputation connected with it: the day he turned 18 they confiscated his two bank accounts, the one with the Dresdner Bank contained his pocket allowance for the month and had a balance of 80.- DM (then about 50.- US $), though under German law pocket money is exempt from distraint, the other with the Sparkasse (saving account) in Tegernheim, a little village outside the Bavarian town of Regensburg, the city where the plaintiff lives, was an account his grand-parents had installed in his name as a present for him when he was a small child and into which they had deposited on

occasions like birthdays gifts of money for him. This account had a balance of roughly 1200.-
DM (then about 900.- US $). Since his 18[th] birthday he had to swear at regular intervals of three
years the oath of insolvency to the finance authorities. The latest he had to swear on 20 Oct 2005.
Because of this seizure of his bank accounts and the oaths of insolvency he had to swear he got
automatically registered in 'Schufa', the German public central register of people financially not
reliable, where anyone can inquire if someone with whom one wants to do business is registered
there. Because of this registration in Schufa things that are a matter of course for others are
impossible for the plaintiff, for example having a bank account in his name, a telephone, a mobile
phone or a car registered in his name, any such things are done for him at present via his mother
and in her name. It is impossible for him to lead a normal life.

55. Such a situation is extremely depressing for a young man who is highly qualified and eager to
work in order to earn his living by himself and establish his place in society. All his classmates
and his mates at university are by now already in good positions. In this connection it may be
permitted to mention that plaintiff is member of "Mensa", a society in Germany for above
average talented persons. In order to be admitted to it an IQ test must be passed which must prove
an IQ of at least 135 of the aspirant. The plaintiff's IQ proved in this test to be 143. Needless to
point out the waste not only for the person himself that is so gifted if he is kept from working and
his talents and education have to lie barren but also for society.

Damages Remedy

56. The Hull Rule states that "under every rule of law and equity, no government is entitled to expropriate private property, for whatever purpose, without provision for prompt, adequate, and effective payment therefore." Plaintiff claims damages remedy to the amount of the 2,300,000.- DM (1,700,000.- US$) that stock and bank assets of the deceased were worth when confiscated in Nov 1985 plus the interest on this amount since its withdrawal, the renouncing by the defendant of the alleged further inheritance obligation of the deceased/plaintiff towards it, compensation for the attorney fees, compensation for expenses like travels to the United States in connection with the present action, compensation for the loss of income and of payment into retirement fund that defendant would have earnt had he been able to accept the offers for employment of Regensburg University, compensation at the discretion of the court for the mental distress of plaintiff since 1991 when once established as heir he found his inheritance confiscated and a law suit against the most powerful state organ waiting for him and more since the judgment of the Berlin fiscal court of September 1993 leaving him at the age of 15 not only to cope with an unjust court decision which drew on a non-valid international military treaty but also leaving him with the mental distress arising from debts of millions to this state organ and with no prospect of a future after having finished his education because of the life-time distraint on his income by the amount exceeding the subsistence level of 800 €, and for the distress, trouble and humiliation he had to bear because of the pressure of the Berlin finance authorities against him (oath of insolvency, 'Schufa'-registration, described supra no 54).

## F. Precedents

57. Judgment file ref United States v. Tiede and Ruskc, criminal cases no 78-001 and 78-001A, United States for Berlin 86 F.R.D. 227; 1979 U.S. Dist. LEXIS 13805). In this judgment in Berlin jurisdiction in a purely German matter is exercised by an American court pursuant to Articles 7 and 10 of Allied Kommandatura Berlin Law No 7. These Articles are quoted verbatim under n2 (page 3 of internet version) of the judgment and run like this: Art. 7: "1. The appropriate Sector Commandant may ...withdraw from a German Court, any proceeding directly affecting any of the persons or matters within the purview of paragraph 2 of the Statement of Principles governing the relationship between the Allied Kommandatura and Greater Berlin. - Art. 10: "The appropriate Sector Commandant may take such measures as he may deem necessary to provide for the determination of cases which under this Law will not be within the jurisdiction of the German Courts." On page 14 the judgment reads:"That law (Allied Kommandatura Law No 7) is still in force today, and was referred to in the communication from the United States authorities to the Berlin Senator for Justice denying the German authorities jurisdiction in the present case." The judgment is published in the internet (address: Allied Kommandatura Law No 7). The judgment is precedent to our case with respect to (a) the legal status of Berlin, (b) the occupation of Berlin, (c) US supreme sovereignty in the American sector in Berlin, (d) the application of Allied Kommandatura Law No 7. The book 'Judgment in Berlin' by H. Stern deals with the trial leading to this judgment.

58. Berlin criminal court judgment (619) Kls 1 St Js 381/85. This is the judgment of the criminal suit of the present case which criminal suit preceded the civil suit. It states only two possible legal routes in occupied Berlin: only Allied Kommandatura Law no 7 applies if someone is a Member of the Berlin Allied Forces providing for his immunity against German jurisdiction. If someone is not a Forces Member only German civil or criminal law applies. Another legal route like pulling a Berlin Forces Member into the realm of German jurisdiction via a military agreement like the NATO Status of Forces Agreement is no possible in Berlin. This judgment with a translation into English is contained in enclosure 50, the proceedings in this judgment are described below in ns. 124-129.

59. The so-called 'Duppelfeld-case' (case 'Dostal et al. v. Vance'), mentioned by H. Stern in his book 'Judgment in Berlin'. Photocopies of the relevant pages of this book, pp 340-342 and Postscript, are enclosed as enclosure 19, see supra no 29. The case was brought twice before the United States District Court in Washington. The first time it was called 'Dostal et al. v. U.S. State Department', file ref unknown, and consisted of the complaint of Berlin citizens against the Berlin US occupation authorities for not granting their consent to a Berlin court to hear the case, which consent the US occupation authority had refused on the basis of Allied Kommandatura Law No 7, Art. 3,2. When the Duppelfeld case was brought for the second time to the United States District Court in Washington, it was called 'Dostal, et al. v. Vance', Civil Action No. 79-1964. This time the Berlin citizens, who had had the chance in the meantime to bring the case before the American Court for Berlin when it convened in Berlin for the case United States v. Tiede and Ruske (supra no 57), complained of the shutting of the United States Court for Berlin

while their case was before it and petitioned to reopen it. Both times the District Court in Washington, D.C. dismissed the case and the Appeal Court also rejected the appeal on roughly this ground: "While it is clear the U.S. Government has not annexed the American sector of West Berlin, and also, that the war with Nazi Germany has been officially over since 1951, the position of the U.S. Force in West Berlin is in many respects that of an occupying force. It is practically "sole sovereign" in its sector, and exercises "supreme authority", local government and institutions and courts being but its creatures." (rejection of the appeal, quoted from"Judgment in Berlin", Postscript). The 'Duppelfeld-case' is precedent to the present case with respect to (a) US sovereignty in the American sector in Berlin, (b) application of Allied Kommand atura Law No 7, (c) Allied (or US) legislation or decision preceding in Berlin any German decision.

60.  The'Gatow firing-range case', a case in the British sector of Berlin. It is called G. Trawnik et Luise Reinelt v. Major-General B.C.G. Lennox and Her Majesty's Attorney -General, ref. file no CH 1983 T No. 3748. In this case the occupation government in the British sector of Berlin refused its consent that it be heard in court (as the United States occupation government did in the Duppelfeld case supra 59. The plaintiffs instead of accepting that this was the end of the matter decided to carry it further and after the German legal remedies had been exhausted it was brought before the High Court in England, which ruled on 28 March 1984 that it could not hear the case. Against this the Berlin citizens appealed, the appeal decision of 13 Dec 1984 is enclosed as enclosure 24. Reference to the refusal of consent for the case to be heard by a court by virtue of Allied Kommandatura Law No 7 is on page 3 of the decision. The decision concludes on page 9:"The plaintiffs may be suffering a wrong for which there is no remedy in our Courts. This is to

be regretted; but sympathy for the plaintiffs is no justification ...". The case is precedent to our case in the same way the Duppelfeld case is, (a) Allied sovereignty in Berlin, (b) application of Allied Kommandatura Law No 7, (c) Allied decision preceding in Berlin any German decision.

**Enclosure 24: Gatow firing-range case**

61. European Commission on Human Rights, application no 6231/73, Ilse Hess against United Kingdom, final decision of 28 May 1975. The United Kingdom as well as France are parties to the European Convention on Human Rights, which means that human rights complaints against these two countries can be brought to the European Court on Human Rights (but human rights violations in Berlin by the other two Berlin Allies, the United States and the Soviet Union, could not be brought before it, they were not party to the Convention). This complaint is the complaint of the wife of Rudolf Hess concerning the detention of her husband Rudolf Hess in Spandau Prison. The decision refutes the complaint/application on the basis of the Four Power Status of Berlin: acts of the United Kingdom in Berlin are not based on the corresponding national legislation, but on the law of nations of the Four Power Status and are as such not measurable with the standards of the European Commission on Human Rights. The Commission repeated this decision on 10 July 1981 with respect to a complaint of Rudolf Hess himself against France. The European Court of Human Rights' judgment, application no 6231/73 was not published. A Photocopy of the summary of it contained in the Yearbook of the European Convention on Human Rights, 1975, The Hague, 1976, pp 146-176, is enclosed as enclosure 25. The decision is precedent to the present case with respect to (a) the joint sovereignty of the Allies in Berlin, (b) the legal status of Berlin.

**Enclosure 25: Summary of decision of Commission on Human Rights application no 6231/73**

62. European Commission on Human Rights, application No 3374/67. This judgment deals with parliamentary immunity which raises similar issues to diplomatic immunity or immunity of a member of an occupation force. The Commission decided "that the immunity from suit of members of parliament was both generally recognized and necessary ... Not the court but the defendant is inaccessible. And it is for the court to apply the corresponding limitation of its jurisdiction." See enclosure 26, a photocopy of page 350 of Digest of Strasbourg Case-Law relating to the European Convention on Human Rights, Vol 1-6, 1984, with a description of the case. The judgment itself seems not to have been published.

**Enclosure 26: description of ECHR decision, application no 3374/67**

63. The same attitude is taken by the International Court of Justice when finding that a national court's admission of an action against a United Nations representative with immunity under international law was a violation of international law. The Court held in its Advisory Opinion concerning the case Curamaswamy that the Government of Malysia should have informed the Malaysian courts of the immunity of Mr. Curamaswamy from legal process with respect to his capacity as Special Rapporteur of the Commission on Human Rights "and that these courts should have dealt the question of immunity as a preliminary issue to be expediously decided." It unanimously stated that Mr. Cumaraswamy should be ""held financially harmless [by Malaysia] for any costs imposed upon him by the Malaysian courts, in particular taxed costs"" (quoted from the press release 99/16 (internet) of the International Court of Justice, see also the summary of the

case under title "Significant Cases" in the internet, both see enclosure 27). See also the Advisory Opinion the International Court of Justice gave in the case of the immunity of Mr. Dumitru Mazilu. A Photocopy of a corresponding internet entry is also contained in enclosure 27. See further the internet entry of the U.S. State Department "U.S Department of State's Report Malaysia Country Report on Human Rights Practices for 1998" referring under paragraph (e) to the case of Curamaswamy.

**Enclosure 27: Advisory Opinions of the International Court of Justice on Immunity**

## G. The Parties

### The plaintiff

64. The plaintiff is his father's sole descendant and heir. Certified photocopy of the inheritance certificate of 19 Sep 1991 is enclosed as enclosure 28. He holds a degree in mathematics from Regensburg University. He has no employment

**Enclosure 28: certified photocopy of inheritance certficate of plaintiff**

65. His father, Dr. Samuel L. Kobre, was an American (USA) citizen of Russian origin. He was a lawyer by profession (Harvard Law School graduate (1937)) and a Member of the Bar of New York and Virginia. He was in the employment of Coca Cola Bottling Plant, Atlanta when he was drafted by his government in the Second World War. He was part of the US troops that embarked on the beaches of Normandy in the dawn of D-day, June 1944 and was part of the first US

military unit that came to Berlin in June 1945. After his release from service in 1946 he was employed as civilian legal officer in the Office of the Military Government of the United States in Germany (OMGUS). When in 1949 the Three Western Powers established a civil occupation government, the so-called High Commission of Germany (HICOG), he was employed in the office of the American High Commissioner in Frankfurt, Germany. In 1950 the United States government authorized him to engage in private law practice in the American sector in Berlin as American attorney-at-law for occupation personnel and occupation matters. In June 1951 he was authorized to practice law in more general terms than at first as he was permitted to have other clients besides occupation personnel and to practice in also American civil law (and not only occupation law). In this capacity as American attorney in Berlin being authorized to practice law for the duration of the occupation of Berlin he was granted the status of "Member of the Berlin Allied Forces" by the highest occupation authority in Europe, the Commander of Headquarters European Command. He died on 26 Nov 1989.

The defendant

66. The defendant is the state of the Federal Republic of Germany.