## H. The Facts

67. In early 1990, the plaintiff, who lived with his mother, stepfather, a brother and a sister in Regensburg, Bavaria, Germany was informed of his father's death in Berlin. The mother of the plaintiff, then a minor of 13 years, as his legal representative was further informed of the chaos that had descended on the deceased in the years before he died: his whole estate had been confiscated by Berlin Zehlendorf taxation authorities for evasion of taxes, further taxation debts of millions existed, the deceased had in the mid-1980s even been in prison for his tax-evasion, and as he had not even been left enough financial means by the taxation authorities to meet his obligations concerning his rent his landlord had evicted him from the flat in which he had lived since 1950, and because of that he had lived since 1988 in a municipal home for the poor where he had died on 26 November 1989 a completely destroyed person.

68. In order to gain insight into what had really happened the plaintiff's mother applied for her son who was the only descendant of the deceased to be established as heir, which was accomplished in September 1991. As the legal representative of her under-age son she then had official access to the files concerning the deceased. She learnt that in November 1985 the taxation authorities had searched the flat of Dr. Kobre, had confiscated his estate and thrown him into prison, from which he was released on parole after four weeks. In the trial that ensued the deceased had indicated that he was a Member of the Allied Forces of Berlin and as such immune from German jurisdiction and taxation. But the US Berlin Mission [military government] to which the court had turned for an official confirmation of the deceased's status had answered that

withdrawn until he died that is that the deceased had indeed until he died been a Member of the Allied Forces of Berlin and in this capacity been immune to German jurisdiction (and taxation) she submitted four letters of the legal section of Headquarters United States European Command, the highest military authority in all Europe, to which she had turned for an official statement on how long the status of the deceased as Berlin Allied Forces Member had lasted. These letters confirmed what the deceased had always maintained, namely that his status did not end by its own terms with the end of the occupation of West Germany and the abolition of the High Commission and its courts there and that it could not be withdrawn at Berlin level and was never withdrawn by the only authority appropriate to withdraw it, which authority was the Commander of Headqarters United States European Command (a four-star general). As it had not expired by itself in 1955 and was never withdrawn by the only official authority able to withdraw it, it had persisted until its bearer's death.

71. In its judgment of September 1993 the Berlin fiscal court acknowledged that the deceased had been a 'US forces member' until he died – contrary to the results of the criminal trial where the status of Dr. Kobre as Berlin US Forces Member had allegedly ended in 1955 - but rejected the challenges nevertheless, regarding the status of the deceased as 'immaterial', as it drew on the provisions of the NATO Status of Forces Agreement. As the NATO Status of Forces Agreement was not valid in occupied Berlin and therefore could not be applied to the case, the plaintiff lodged an appeal against this judgment to higher courts, the German federal fiscal court, the German Constitutional Court and finally the European Commission on Human Rights, which all rejected his appeal.

Historical Background

72. The plaintiff claims that his father, an American civilian attorney admitted by the Commander of Headquarters United States European Command, that is admitted by the U.S. government's highest military representative in Europe as attorney in Berlin, Germany for occupation matters with an office in the American sector of Berlin, was in spite of being self-employed a Member of the Berlin Allied Forces and as such immune from German jurisdiction and taxation, further that all German tax assessments or the court decisions involving these assessments against his father are according to law null and void. In order to understand the plaintiff's claim the historical background and legal status of Berlin between 1945 and 1990 must be traced.

   The occupation of Germany and of Berlin

73. Judgment United States v. Hans Detlef Alexander Tiede and Ingrid Ruske, Criminal Case No 78-001; Criminal Case No 78-001 A, United States Court for Berlin, 86 F.R.D.227 (supra no 57) contains an overview of the Allied Occupation of Germany and of Berlin with documentation. There is also an overview on the status of Berlin and the Allies' position there in the decision of 28 May 1975 of the European Commission on Human Rights, application no 6231/73, Ilse Hess v. United Kingdom. A summary of this decision is published in the Yearbook of the European Convention on Human Rights, 1975, The Hague, 1976, pp 146-176, the overview on the status of Berlin is from page 152 ("Turning to the historical background of the case...") to page 158 ("Since 1962, contacts about Four Powers matters, including the prison, have taken place between the Allied authorities of the Western Sectors of Berlin and the Soviet Embassy in East

Berlin.") (supra no 61 and enclosure 25). The plaintiff refers to both overviews and summarizes their contents in the following, relying in particular on the presentation of judgment United States v. Tiede and Ruske, combining its two parts, the occupation of Germany and the occupation of Berlin, into one:

74. In the "London Conference" in September 1944 the Allies prepared for the occupation of a defeated Germany. They agreed that each Ally would obtain an occupation zone in Germany and that Berlin, the capital of the German Reich, which happened to be situated within the area that was to be the Soviet Power's occupation zone was to be "jointly occupied ..." by them (see supra nos 13 and 14 with enclosures 4 and 5).

75. Berlin was accordingly divided by the Allies into three, later four (after the surrender of Germany when France could join in) sectors, each to be occupied by one of the Allied Powers. Further, an "Inter-Allied Governing Authority" was established for Berlin which – the Russian word for 'government' being "Komendatura" - was called "Allied Kommandatura". It combined military and civil authority, similar to the President of the United States who is the highest military and civil US authority. Subject to the Allied Kommandatura, which was responsible for the administration of the city as a whole and for the control of local German authorities, each sector had a Military Sector Commandant who despite his military designation and his rank as a one- or two-star general again combined the highest military and civil functions in his sector. The individual Sector Commandant had authority to control and administer his particular sector and

enclosures 4-15, especially the Allies' 'Declaration on Berlin' (supra no 22, enclosure 13 (Art. III(a) and (c)) and the Quadripartite Agreement of 1971 (supra no 23, enclosure 14, in particular Part II, B, Annex II, 1 and 2 etc.). Enclosed as enclosure 28 is a photocopy of the NATO protocol signed in Paris (within the 'Paris Conventions') on 23 October 1954 by the Federal Republic. It contains no "Berlin-clause" and could not contain one. As to the concept 'Berlin-clause' see below no 79.

**Enclosure 28: NATO protocol as signed by Konrad Adenauer** *(a)*

79. The "Paris Conventions" consist of a number of conventions in the various fields in which the rights and responsibilities held by the Allies since 1945 were returned to the Germans, like the 'Finance Convention', the 'Convention on the Settlement of Matters arising out of the War and the Occupation' etc. The Convention in which the Allies terminated the Occupation regime in the Federal Republic of Germany, revoked the Occupation Statute, abolished the Allied High Commission and returned to the Federal Republic full sovereignty over its internal and external affairs is the 'Convention on the Relation between the Three Powers and the Federal Republic of Germany'. In Article 2 of this convention the Allies state concerning Berlin: "In view of the international situation, which has so far prevented the re-unification of Germany and the conclusion of a peace settlement, the Three Powers retain the rights and the responsibilities, heretofore exercised or held by them, relating to Berlin and to Germany as a whole, including the re-unification of Germany and a peace settlement." (supra no 21, enclosure 12). This means no less than that the status of Berlin as occupied territory and the waiver of immunity of West Germany with regard to occupied Berlin continued until reunification in 1990. Such a waiver of

immunity the Foreign Sovereign Immunity Act demands as prerequisite for the exercise of jurisdiction of a US court over a foreign power, and the United States District Court in Washington, decided already in United States v. Tiede' (supra no 57) and in 'Dostal, et al. v. Vance', Civil Action No. 79-1964 (supra no 29 with enclosure 19 and supra no 59) that this waiver of immunity of Germany exists with respect to the American sector in West Berlin.

80. In other words with regard to Berlin the Allies did not give back to Germany any sovereignty and the western sectors of Berlin remained occupied by the Allies until reunification. Whereas the Federal Republic could rearm itself and whereas foreign forces could from 1955 only be stationed in the Federal Republic by the consent of the  Federal Republic, which consent was based on the conditions laid down in the NATO Status of Forces Agreement, an agreement that the Federal Republic had signed within the 'Paris Conventions', the  Berlin Allied Forces would stay in Berlin until 1990 by virtue of their original rights and by their own sovereignty, their joint supreme sovereignty as the Berlin Allies, due to the unconditional surrender of Germany in 1945.

81. The authors Hendry and Wood state in 1987 in their book, The Legal Status of Berlin, on p 36: "As regards Berlin, they [the Allies] retain the plenitude of supreme authority assumed in 1945. They have not subsequently relinquished any part of their supreme authority, ..."

82. The rights of the Western Allies in Berlin were all the time from 1945 until 1990 original rights due to the unconditional surrender of Germany in 1945 and did not rest on agreements – not agreements with the Soviet Union in whose zone Berlin was geographically situated, still less with West Germany. This was the attitude of the Western Allies – and of the home courts of the

Allies (United States v. Tiede; Dostal v. Haig/ Dostal v. Vance, Trawnik et Reinelt v. Major-General B.C.G. Lennox and Her Majesty's Attorney General), as well as that of the Federal Republic (Dostal v. Haig/Dostal v. Vance and Trawnik et Reinelt v.Major-General B.C.G. Lennox were carried first to German courts which refused to hear them for the lack of consent of the Allies to do so, - only after all German courts had refused to hear them they were carried to the US district court in Washington, D.C. and to the Supreme High Court of England) in contrast to that of the Soviet Union. Desiring the Western Powers to give up West Berlin the Soviet Union argued they had merely rights in Berlin under Four-Power agreements, which rights were lost as these agreements had been terminated by the difficulties between the Western Powers and the Soviet Power. But Allied rights in Berlin derived from the unconditional surrender of Germany, consequently they existed first, as a basis for and independently of the wartime and post-war agreements of the Allies among themselves, still less upon any agreement on the part of Germany itself: Henry/Wood, The Legal Status of Berlin, p 32: "Original Occupation Rights. Allied rights in relation to Berlin (as in relation to Germany as a whole) are original rights deriving from the defeat of the German armed forces, the unconditional surrender of Germany and the assumption by the four Powers jointly of supreme authority with respect to Germany. These rights exist independently of and underlie the series of agreements specifying the areas in which and the methods by which they are to be exercised. The occupation of Germany was agreed upon by the Allies during the war, and took place in accordance with the wartime agreements. The rights that flow from the defeat of Germany do not themselves depend upon wartime and post-war agreements and decisions of the four Powers, still less upon any agreement of Germany itself."

83. On 5 May 1955, the day of the official termination of the occupation regime in the Federal Republic, the Allied Kommandatura in Berlin (read: inter-Allied Berlin military occupation government) issued a statement called the Declaration on Berlin of 5 May 1955. See supra no 22 with its quotations of the 'Declaration on Berlin' and enclosure 13.

84. The Allies stated in it that they retained in Berlin all their original rights but refrained themselves to normally exercise power only concerning their forces, relations of Berlin with authorities abroad (international treaties and relations) and occupation legislation. Allied rights and responsibilities relating to Berlin and to Germany as a whole, Allied occupation legislation in Berlin together with the Four Power institutions there were only dissolved under Art. 7 of the Two Plus Four Settlement, in force from 15. March 1991 (supra no 24, enclosure 15).

<u>    Legal Background</u>

Occupied Berlin and International Treaties

85. A military international treaty, the NATO Status of Forces Agreement, was applied in the present case by defendant in order to be able to exercise jurisdiction on someone (the deceased) who no doubt was a US forces member and could therefore not be judged without further ado like a civilian. As the FSIA is ruled by an international treaty and also the Alien Tort Claims Act is triggered if a tort is committed in violation of an international treaty of which the Uinited States is party special attention must be paid to the question of whether the Federal Republic of Germany was entitled (or sovereign) before reunification in 1990 to extend international treaties to occupied Berlin. "Relations of Berlin with authorities abroad" is one of the fields which the

Allies reserved to themselves in paragraph II, c of the Declaration on Berlin. In other words, the authority for relations of occupied Berlin with authorities abroad was the Allied Kommandatura and not the Federal Republic. This issue is also one of the major concerns in the Quadripartite Agreement of 1971. In Annex IV, A, the Western Powers inform the Soviets that

"The Governments of the French Republic, the United Kingdom and the United States of America maintain their rights and responsibilities relating to the representation abroad of the interests of the Western Sectors of Berlin and their permanent residents, including those rights and responsibilities concerning matters of security and status, both in international organizations and in relations with other countries...(2)(b) In accordance with established procedures, international agreements and arrangements entered into by the Federal Republic of Germany may be extended to the Western Sectors of Berlin provided that the extension of such agreements and arrangements is specified in each case." This means that international treaties which the Federal Republic signed automatically included only the Federal Republic and excluded Berlin unless they contained the"Berlin-clause" which they did if the Allies had agreed to their extension to Berlin. This "Berlin-clause" had to contain the specification that the treaty extended to Berlin and that by it the rights and responsibilities of the Allies with respect to Berlin and to Germany as a whole were not affected. A typical example of an international treaty signed by the Federal Republic of Germany containing the "Berlin clause" is the "Convention for the Suppression of Unlawful Seizure of Aircraft" of 16 Dec 1970 and it is enclosed in enclosure 29. On page 5 of it there is the "Berlin clause" ('Declaration of Federal Republic of Germany') and on page 9 there are the corresponding statements of the Soviet Union and the Western Powers.

**Enclosure 29: Convention for the Suppression of Unlawful Seizure of Aircraft**

86. While most international treaties entered into by the Federal Republic of Germany were extended to Berlin by means of the Berlin clause there were strict exceptions in the fields of status and of forces. Hendry and Wood who devote in their book 'The Legal Status of Berlin' (1987) a whole chapter to the question of the external representation of Berlin (Part Five, The External Representation of Berlin's Interests, pages 189- 231) state on page 201: "Thus the North Atlantic Treaty and related agreements have not been extended [to Berlin]. The same applies to certain other treaties of a military nature, ... nor do the Bonn/Paris Conventions of 1952/1954".

[See Annex IV of the Quadripartite Agreement of 1971 in which the Four Allies state in Annex IV,A,1 : 1. The Governments of the French Republic, the United Kingdom and the United States of America maintain their rights and responsibilities relating to the representation abroad of the interests of the Western Sectors of Berlin and their permanent residents, including those rights and responsibilities concerning matters of security and status, both in international organizations and in relations with other countries.] see supra no 23.

87. The North Atlantic Pact or Treaty (or the NATO Status of Forces Agreement which is part of it) concerns as an international agreement firstly the field of 'relations of Berlin with authorities abroad' which the Allies reserved to themselves in the Declaration on Berlin. But it is a military treaty and as such it concerns another field they reserved to themselves, the Allied Forces of Berlin, the field which they placed before any other reserved field in the Declaration on Berlin, specifying thereby that the security, the interests and the immunities of the Allied Forces

(Declaration on Berlin, Art. III (a)) were their primary field of power. As in any occupied territory only the occupier is in arms it is self evident that full power and authority in military matters, including the power of making military international agreements or arrangements, is with him and not with the occupee. The Federal Republic was from its origin in1949 to 1990 not sovereign with respect to Berlin, due to Art. 2 of the "Convention on Relations between the Three Powers and the Federal Republic of Germany" in which the Three Allies had retained "the rights and responsibilities heretofore exercised or held by them, relating to Berlin and to Germany as a whole". That is, the supreme authority concerning Berlin was still with the Allies and their right to be in Berlin was part of their original rights based on their defeat of Germany in 1945. They did not need a military agreement with or the consent of the Federal Republic to be in Berlin.

Occupied Berlin and its Hierarchy of law

88. In the legal hierarchy occupation law ranks in the occupied region above and before other local law and in Berlin Allied law enacted by the Victorious Powers ranked before German law. See supra no 22 and enclosure 13, the Declaration on Berlin of 5 May 1955, § VII: "In case of inconsistency with Allied legislation, or with other measures of the Allied authorities, or with the rights of the Allied authorities under this Declaration, Berlin legislation will be subject to repeal or annulment by the Allied Kommandatura." Hendry and Wood state in 'The Legal Status of Berlin', (1987), p 88, on the relationship between Allied and German Law:

"The highest legislative authority in Berlin is the Allied Kommandatura. Subject thereto, legislative power in each Sector resides with the Commandant. As was expressly confirmed by section 44 of Control Council Proclamation No 2 of 20 September 1945, Allied law overrides any

provisions of German law inconsistent therewith." [The mentioned Control Council was the first Inter-Allied occupation government which included the Soviet Union. It laid down its work in 1949 when difficulties between the Western Forces and the Eastern Force became insurmountable, but did not dissolve in order to resume work when cooperation was possible again. The Western Forces then formed the High Commission of Germany, an occupation government for only the Western zones.]

As to Allied legislation preceding German law inconsistent with it see also the Quadripartite Agreement of 1971, Annex II, 2: "The provisions of the Basic Law of the Federal Republic of Germany and of the Constitution operative in the Western Sector of Berlin which contradict the above have been suspended and continue not to be in effect. "


89. German handbooks on occupation law or on the status of Berlin emphasize, too, that occupation law ranks in the legal hierarchy above the German law valid in Berlin: cf. e.g. Scholz, Der Status Berlins, in Isensee-Kirchhof, Handbuch des Staatsrechts, vol 1, 1987, marg. No 40 for §9 or Schröder, D., Das Besatzungsrecht in Berlin (1990).


90. The German civil administration in Berlin has never viewed the matter otherwise. The then Governing Mayor of Berlin, Mr. Diepgen, put it thus in a letter to a member of the Bundestag (West German Congress) dated 8 March 1985: "In international law the situation is that that German constitutional law is overlaid by Allied stipulations; this means that the occupation law of the Three Powers takes precedence over German law." (Quoted  from Udo Wetzlaugh, Die Alliierten in Berlin, Berlin-Verlag, Berlin, 1988, p 399. The book was published with a foreword

by the then Governing Mayor as a special publication of the (government-run) Centre for Political Education in Berlin).

91. One of the leading experts on Berlin occupation law, Dieter Schröder, till 1991 Head of the Chancellery of the Berlin Senate (state government), has formulated the unanimous view of the relation of occupation law to German law thus: "The primary source of law in Berlin is the supreme authority of the occupying powers, the enforcement of which is partly regulated by international treaties between the four powers. From the supreme authority of the occupying powers arises the law established by the Control Council and also the law established in Berlin by the Allied Kommandatura or by a Sector Commandant. Subordinate to this law is the law given by statutes of the Federal Republic of Germany which have been adopted by Berlin, ..." ( our emphasis)(Cf. Dieter Schröder, Die ausländischen Vertretungen in Berlin [External Representations of Berlin], 1983, p 58).

92. The precedents supra no 57 (United States Court for Berlin v. Tiede), no 59 ('Duppelfeld case', Dostal v. US State Department/ v. Vance), no 60 (Gatow firing range case) and no 61 (Hess v. United Kingdom) are based on the supremacy of occupation legislation or decision of the occupation Powers. See also the statement of the United States Court of Appeals for the District of Columbia Circuit in its rejection of the appeal in the case 'Dostal et al. v. Vance, Civil Action no 79-1964: "... the U.S. Force in West Berlin is ... "sole sovereign" in its sector, and exercises "supreme authority", local government and institutions and courts being but its creatures." (H. J. Stern, Judgment in Berlin, 1984, postscript). See also the statement of the

Department of State in the memorandum to the United States Judge for Berlin of March 1979 expressing the supremacy of any Allied decision over any German decision (legislation), which statement reads: "THE UNITED STATES' AUTHORITY IN BERLIN UNDER INTERNATIONAL LAW IS DERIVED FROM RIGHTS OF CONQUEST UNDER THE LAW OF WAR … not the consent of the governed." (H. J. Stern, Judgment in Berlin (1984), p 94).

93. Of Allied legislation in Berlin we need to know for the present case only two laws: Allied Kommandatura Law No 2, which is enclosed in enclosure 33. The law's heading is 'Definitions' and the Allies define in it whom they count as Berlin Allied Forces. The second law we need to know is Allied Kommandatura Law No 7, the law headed 'Judicial Powers in the Reserved Fields', in which the Allies specify the fields of jurisdiction reserved to them, the Allies, excluding thereby any German jurisdiction or other interference in these fields (the law is enclosed in enclosure 1).

Occupied Berlin and its Forces

94. The only forces in Berlin were the Allied (occupation) Forces. They stayed in Berlin on their own sovereignty due to the unconditional surrender of Germany in 1945 and not by agreement with the Federal or the Democratic Republic of Germany or with West Berlin. In Allied Kommandatura Law No 2 the Allies defined themselves, that is whom they counted among the Berlin Allied Forces. The law is enclosed in enclosure 32. Their members as members of occupation forces were immune to the jurisdiction or taxation of the occupee and that for two reasons, firstly because there was no law subjecting them to the taxation of the occupee (no law,

no tax, the law has to exist first. This refers even to tax included in the price of goods. If therefore

a member of the Allied Forces of Berlin bought goods in Berlin or German shops he was

reimbursed for the tax included in the price of the article, there was a special office in Berlin for

this.) Secondly because there was a law exempting them from the jurisdiction of Germany: Allied

Kommandatura Law No 7. This law defines the fields of jurisdiction which the Allies reserved

under all circumstances to themselves, the Allies, thereby excluding any German jurisdiction in

these fields, and it is self-evident that German jurisdiction was excluded primarily for the Allied

Forces and their members (Art. 1 and 2) and secondly for Allied legislation, decisions or orders

(Art. 3).


   Factual Background


95. The plaintiff's father, Dr. Samuel L. Kobre, engaged in 1950 in private law practice as

attorney for occupation law, US military and civil law and other specialized matters (enclosure

30) in Berlin, Germany with admissions from the US High Commission for Germany and the

Commander of Headquarters United States European Command (HQ USEUCOM). Both were

the highest occupation organs and as such superior to any authority in Berlin, including the

highest occupation authority there, the Allied Kommandatura of Berlin. The orders of the High

Commissioner as well as those of the Commander of HQ USEUCOM had to be obeyed in Berlin.

Therefore the authorizations of the deceased were not only valid in Berlin but had to be obeyed

there. The Berlin Allied Kommandatura or the US Sector Commandant could not simply decide

they did not want Dr. Kobre in Berlin and they could not withdraw the authorizations, as the US

Sector Commandant as well as the Berlin Allied Kommandatura were authorities inferior to the

ones that had issued the authorizations.  The admissions are enclosed in  31 and 32.

**Enclosure 30: photocopy of Dr. Kobre's business card**
**Enclosure 31: authorization HICOG 8 August 1950**
**Enclosure 32: military order HQ USEUCOM 15 August 1950**


Dr. Kobre's status as a member of the Allies forces of Berlin

96. Membership of the 'Allied Forces'in Berlin is defined by Law No 2 of the Allied

Kommandatura dated 9 Feb 1950. It was never repealed by the Allies and remained in force like

the rest of occupation law until 1990. Law No 2, in the two original languages and the German

translation, is enclosed as enclosure 33.

**Enclosure 33: Allied Kommandatura Law No 2**


97. Art. 1 No 3 of Law No 2 of the Allied Kommandatura in Berlin defines the term 'Allied

Forces'. There we read in the English version: "The expression 'Allied Forces' shall include: (e)

non-German persons whose presence in Greater Berlin is **certified** by the Allied Kommandatura

or the Allied Commandant of any of the Sectors **to be necessary for the purposes of the**

**occupation**' (our emphasis). Because of this particular certification such members of the Berlin

Allied Forces were also called 'certified persons'.


98. The plaintiff's father came under this heading. On 13 June 1951 the Commander of HQ

USEUCOM, General Handy, issued a military order stating in para 2: "The presence of Mr.

Samuel L. Kobre in the US Areas of Responsibility in Germany is certified to be necessary for

the purposes of the occupation." (our emphasis). The position of General Handy at that time, that

is the rank and position of the military authority who issued this certification for Samuel L.

Kobre, can be taken from the "Table of Haedquarters and Key Personnel, Headquarters ...

EUCOM" a declassified document published in the internet by the Historical Division, HQ

EUCOM. The document shows that General Handy was from Sep 49 - Aug 52 Commander in

Chief, a rank which in 1945 was held by General Eisenhower, and as one of the successors in

office of General Eisenhower he issued this 13 June 1951 military command. One can be certain

that he knew what he was doing when he certified Samuel L. Kobre to be necessary for the

puroposes of the occupation that is when he endowed him with the status of immunity against

German authority. The copy of the military order of 13 June 1951 together with the table of the

Historical Division, HQ EUCOM is enclosed as enclosure 34. Concerning the copy of the order it

has to be said that during the period between Dr. Kobre's death and the establishment of his heir

the City of Berlin installed an administrator for the affairs of the deceased who discarded nearly

all of the deceased's "old papers". Among this material that he threw away there must have been

the originals of most of the deceased's personal documents, for example the original of this

particular military order of 13 June 1951. But as the deceased had in the criminal suit described

below nos 122-128 submitted in the hearing of 4 May 1987 the original of this order which the

court had photocopied for the files and as the minutes of the trial state this submission of the

original by the plaintiff and the photocopying of the court of this original in the hearing of 4 May

1987 we enclose a certified photocopy of the photocopy of this 13 June 1951 military order as it

is contained in the court files which photocopy bears top the handwritten note by the presiding

judge Bräutigam stating that the document from which this photocopy was taken was submitted

on 4 May 1987 and we enclose further a certified photocopy of the minutes of the hearing of 4

May 1987 stating the submission of the original. The translation into English of the pertinent part

of the minutes runs like this: "The accused submitted a letter of the American embassy of 28

April 1978 and a letter of 24 April 1957, on which he expressed an opinion. Further he submitted

a letter of 13 June 1951, on which he expressed an opinion. The letters were photocopied and

taken to the files. The originals were given back to the accused."

**Enclosure 34: certified photocopy of photocopy of military order HQ USEUCOM 13 June
1951 as contained in the court files file ref 1/St/Js 381/85 together with certified photocopy
of minutes of hearing of 4 May 1987 of criminal suit file ref 1/ St/Js 381/85.**

99. Plaintiff at various instances in the past turned to the Pentagon with the question if its

archives with material on the occupation of Berlin contained a copy of this EUCOM order of 13

June 1951, but was told that orders relating to a person are destroyed after this person's death.

Only a few weeks ago he found out about the Military History Office of the American Forces in

Europe which is situated in Heidelberg. He turned to it with the question if its files on the

occupation of Berlin contained a copy of this 13 June 1951 military order. Though there has been

no useful result in this matter up to this day, plaintiff hopes that a copy of this order can be

located in the files of the US Forces Military History Office, which copy he will submit to this

court when it turns up.

100. This 13 June 1951 military order is a military order 'BY COMMAND OF GENERAL

HANDY'. General Handy was the Commander of HQ USEUCOM and as such not only the

Commander in Chief of the US Forces in Europe (see supra no 98), but also also the Supreme

Allied Commander Europe, that is all NATO member nations in Europe were under his

command. With regard to Berlin he was the highest military occupation authority on European soil. World-wide there were only 2 authorities higher in rank: the US Secretary of Defense and ultimately the President of the United States. As according to military rules a military command can only be withdrawn by an officer possessing this same command line, and only if this officer has the same or a higher rank as the one who had issued the original command, therefore the status of Dr. Kobre as a civilian attorney with an office in Berlin and as a Berlin Allied Forces Member granted in the military order of 13 June 1951 could not be withdrawn by any authority in Europe except by its highest military authority, the Commander of HQ USEUCOM:

101. With this military order Dr. Kobre had become a member of the Allied Forces of Berlin. He was not a member because of being an active soldier (a member of the Allied Forces according to Art. I, 3(b) of Allied Kommandatura Law No 2), nor because of being a military or civilian serving with the Occupation Authorities (a member of the Allied Forces according to Art. I, 3(c) of Allied Kommandatura Law No 2), nor because of being a family member of a forces member, a 'dependant' (a member of the Allied Forces according to Art. I, 3(d) of Allied Kommandatura Law No 2) but 'solely' on possessing a certification by an appropriate occupation authority as being necessary for the purposes of the occupation as required by Art. I. 3(e) of Allied Kommandatura Law No 2, which certification was granted by the Commander of HQ USEUCOM and formed § 2 of Dr. Kobre's 13 June 1951 HQ USEUCOM-order.

102. It is true that the certificate of necessity in § 2 of the 13 June 1951 military order was not issued by the Allied Kommandatura or the American Sector Commandant in Berlin as required

by this law, but the Commander of HQ USEUCOM, as the American Sector Commandant's superior, was entitled to decide in place of the latter or to issue military orders concerning Berlin (the 13 June 1951 authorization is a military order), which decisions or orders, due to military hierarchy, took precedence in Berlin over decisions of Berlin American military authorities.

103. It is also immaterial that Dr. Kobre's presence for occupation purposes was declared necessary for the US Areas of Responsibility in Germany as a whole, as this automatically includes Berlin. As the location of his office the 13 June 1951 EUCOM-order designated Berlin, and not, for example, Frankfurt or Heidelberg, which is decisive for the question of which forces he was a member of, the Allied Forces in Berlin or the US Forces in West Germany. As the 13 June 1951-EUCOM order designates his office as being in Berlin it designates him at the same time as part of the forces there, that is the Allied Forces in Berlin. Accordingly he was granted his status as Allied Forces Member according to an Allied Kommandatura Law (Allied Kommandatura Law No 2), that is a Berlin occupation law and he shared the destiny of the Berlin Allied Forces: Berlin remained occupied, the Allied Kommandatura continued in Berlin, Allied occupation legislation remained in force and the Allied Forces of Berlin continued to be occupation forces in Berlin, etc. (official statements by Chief of US Mission and by legal section of HQ USEUCOM below no 44 and nos 52-55).

104. It is further immaterial that West Germany became independent in 1955 and that the High Commission of Germany was abolished. This had no impact on Berlin, for as everything there remained the same all occupation orders remained in force. We emphasize this as US Berlin

officials argued later that Dr. Kobre's authorizations expired 'automatically' with the end of the High Commission of Germany. For Berlin a new "High Commission" was created when the High Commission of Germany was abolished which new High Commission was called in the US sector of Berlin 'the US Mission, Berlin', in the other sectors of Berlin it carried the more precise designation of 'British Military Government' in the British sector and of 'gouvernement militaire' in the French sector. As its 'heads' the ambassador of each the Powers were appointed. Therefore until 1990 the ambassadors of the Three Western Powers possessed in addition to their capacity as ambassors of their countries to West Germany, the capacity of Head of the West-Berlin occupation regime of their countries. Further the Office of the 'Chief of the US Mission' was created with supreme authority. In other words the US State Department's highest diplomat in Germany, the Chief of the US Mission, was also the highest civil occupation authority for Berlin as long as it was occupied, possessing powers that had once been with the High Commission, that is he was the "Berlin US High Commissioner" and the same applies to the Chief of the French and British Missions. So much for the alleged abolition of the High Commission in Berlin: It was seamlessly replaced. But more important is the fact that Dr. Kobre's status as an attorney in Berlin and as Allied Forces Member was granted in the authorization of 13 June 1951, which is a military command by HQ USEUCOM (and not a civil document by the civil authority HICOG), and though the authorization included US HICOG court representation, it was not limited to it. Its validity therefore did not depend on the existence of HICOG or its courts. EUCOM Letter, AG 250.44 JAG-AG0, 10 October 1950 pursuant to and in accordance with all the provisions of which Dr. Kobre had been authorized in the HQ USEUCOM-order of 13 June 1951 to practice law in Berlin, Germany is explicitly stated to apply

to "(2.b.) all matters generally the subject of the relation between attorney and client.". Even without HICOG court representation after the abolition of HICOG courts in 1955, there were legal matters left in occupied Berlin for a US attorney: Anything involving the vast field of occupation legislation, further anything covering US military legislation and court martial representation and US civil law. And as long as Dr. Kobre gave priority to US occupation personnel, that is US military personnel in Berlin, he could take clients that were civilians, both US civilians and civilians of other nationality, for example Germans or Berliners. A photocopy of page 2 of the EUCOM letter, AG 250.4 JAG-AGO, 16 October 1950 is enclosed as enclosure 34.

**Enclosure 34: (a) page 2 of HQ USEUCOM letter AG 250.4 JAG-AGO, 16 Oct 1950**

104 a.  Referred is in this connection to a letter of 14 Feb 1952 to Mr. Samuel L. Kobre from the Office of the US Commander, Berlin APO 742, signed by LT Colonel L. J. Legere, Jr, General Staff, Executive Officer reading "… your presence and operation in Berlin result in the furnishing of needed services to the members of the American community here." As the occupation regime High Commission of Germany was not installed to govern the occupier, that is the Allies and their personnel, but to govern defeated Germany and as the courts of the High Commission were courts installed by the occupation regime not for the Allies and their members but for Germans or non- Allied occupation personnel in Germany, and as they dealt with matters that the occupiers did not pass onto German courts until the end of the occupation, like for example war criminals, espionage, violation of occupation legislation, etc. this statement of the United States Commander, Berlin in this letter of 14 Feb 1952 on Dr. Kobre's furnishing of needed services to the American community in Berlin automatically excluded anything within the authority of

HICOG or its courts and referred exclusively to all the other services in legal matters that would turn up in the American community in Berlin. That is fairly shortly after the establishing of Dr. Kobre as civilian U.S. attorney in Berlin and a fairly long period (three years) before the end of the High Commission of Germany Dr. Kobre was stated in this letter to be needed for services other than those connected with HICOG and its courts. A photocopy of the letter of 14 February 1952 is enclosed as enclosure 34 a.

**Enclosure 34 a: certified photocopy of the photocopy of this letter of 14 February 1952 in the files of the criminal procedure**

105. The significance of the 'certification' in para 2 of the military command of 13 June 1951 – there were, of course, other 'certified persons' in Berlin (among them the branches of the two US banks American Express and Federal Service Credit Union on the American post in Berlin, the bank institutions as well as their personnel held 'certified status', there were also a car-dealer and a broker,) besides Dr. Kobre, not only with the US Forces but with the other two Allies as well (in the French sector we know of a French pharmacist and in the British sector a BBC reporter) – was the bonus connected with it: its bearer as an Allied forces member, being immune from German jurisdiction, was not subject to German taxation. Moreover there was no law to subject the Berlin Allied Forces to German taxation. Occupation forces and their members are never subject to the taxation of the occupied region. As supreme legislative and executive in the occupied area the occupier would be the sole authority to pass the law that subjected him to the taxation of the occupee – which no occupation power ever did. In other words, as such 'certified persons' as Dr. Kobre were living and earning their livings not in their homelands but in the occupied area they were taxed at home, if they were taxed there at all only on their income earned

at home – which in the case of Dr. Kobre,  income on US stock, was deducted automatically. Their income earned in the country of stay was free of taxation due to their status as occupation forces members. Such persons could enjoy the greater part of their income tax-free.

106. Such a financial bonus by virtue of a special status exempting one from taxation is a normal feature not only of occupation but also of other than occupation circumstances. Governments in this way induce highly qualified individuals to serve outside their home countries – in the interest, however, of a government, either their own or that of the foreign country. Dr. Kobre, for instance, ran a law office for the benefit of the US forces, who thus had right there in Berlin the choice of an independent, highly qualified US attorney besides the legal adviser of the forces, that is their opportunities were adapted to those of the forces at home and also of the forces in West Germany, who had the choice of American attorneys in Frankfurt, Heidelberg and Munich. As to the practice of attracting qualified individuals with tax-free income in other than occupation circumstances we may think of the diplomatic personnel of  countries or the practice of countries of sending teachers with a special status abroad, or the practice of states attracting highly qualified individuals from other countries, as Saudi Arabia attracted architects and engineers from all countries with exorbitant tax-free salaries when it built up modern Saudi Arabia in the1960s, and the Vatican never gets turned down by the clergy from all over the world whom it calls to live and work within its walls, not because of the distinction connected with employment in the Vatican but because of the tax-free salary and the immunity offered with it. If individuals go abroad in order to work in the interest of a country – be it their own or a foreign country – there must be some sort of financial bonus that goes with it. Otherwise no-one with a costly

education and a brilliant career at home – Dr. Kobre had graduated from Harvard Law School –
would be prepared to engage in a job abroad with all the disadvantages of being abroad. So much
for the special status of Dr. Kobre.

Attitude of Berlin US government officials towards Dr. Kobre

107. In September 1954 rumors arose out of thin air in the American staff in Berlin that Dr.Kobre
was a spy for East Germany. Though all the investigations of the relevant US Secret Services -
the FBI and AFOSI (Air Force Office of Secret Intelligence) investigated Dr. Kobre from 24 Sept
1954 until 31 March 1956 – proved negative, Berlin US occupation officials treated him until his
dying day as if he were a fraud. Enclosure 35 is various photocopies taken from the FBI file on
Kobre, which plaintiff found among the deceased's papers. (a) is a report from his Master Service
File on his professional experience (he had personally been present in Germany from the very
beginning of its occupation and had worked as legal officer with the highest occupation
authorities, the Office of Military Government (OMGUS) and the US High Commissioner), (b) is
a list of all the investigation reports on him completed by mid-1955, and (c) is the closing of the
file because all the investigation on him had "proved [sic] no useful result". It finishes
nevertheless with the remark that "subject is still of interest ... because of his past record...".

**Enclosure 35: copies taken from FBI file Kobre**

108. This "past record" proved to be three items which made Dr. Kobre "still of interest" for the
US secret services. The first was that he had Russian parents (they emigrated to the US in 1906),
the second was that one of his former roommates in the 1930s was suspected to be a communist

(which suspicion proved unfounded), and the third was that he had travelled in 1937 to Europe, and visited as well as England, France, Holland, Denmark, Germany, Austria, Italy, Czechoslovakia, Hungary and Poland also Russia, the land of his fathers, the land his parents had left when it still had a Czar, Czar Nicolas II, but which incidentally had turned to communism in the meantime.

109. Ironically the other side, that is East Berlin, also observed Dr. Kobre, suspecting him to be an agent of and for the United States. As the only US attorney in Berlin he was of course under its attention. The plaintiff investigated a STASI  (East German State Security Organ) file on his father which file was closed in the mid-1960s with the remark that all enquiries and observations on the subject had proved the subject to be completely "harmless". Enclosure 36 is the closing page of the STASI-report.

**Enclosure 36: photocopy of page from STASI file Kobre**

110. Officially based on the suspicion of espionage behind Dr. Kobre's back efforts were going on in the US forces in Germany to throw him out of Berlin, or to withdraw his authorization as a lawyer in Berlin and his Berlin Allied Forces Member status. In the FBI file on Dr. Kobre there is a report which the liaison representative in the Headquarters US Army Europe in Heidelberg sent on 12 May 1955 to the Director of FBI running like this: "...there is presently pending through the Judge Advocate General's Division of Hq., US Army Europe, a decision as to whether to institute proceedings looking toward the disbarment of the subject in Berlin. These proceedings

would be based upon alleged unprofessional conduct and not on the allegations of contact with Soviet officials."

The report is enclosed as enclosure 37.

**Enclosure 37: photocopy of FBI report of 12 May 1955 Kobre**

111. The date of the report, 12 May 1955, is remarkable as the occupation of West Germany ended on 5 May 1955. If Dr. Kobre's status or his authorizations expired automatically with the end of the occupation of West Germany or with the end of HICOG in West Germany as was always maintained from 1955 to 1989 by US Command, Berlin (military unit, Berlin) and US Mission, Berlin (read: US military government in Berlin), why would anyone still contemplate "proceedings looking toward the disbarment of subject in Berlin" and even intend to lie to and give knowingly false evidence to the court in such proceedings ("proceedings would be based upon alleged (!) unprofessional conduct", see quotation of FBI report in enclosure 37) on 12 May 1955?

112. These "proceedings looking towards the disbarment" of Dr. Kobre in Berlin were contemplated in Headquarters US Army Europe because (a) the authorizations had not expired on 5 May 1955 with the end of HICOG and its courts and (b) it was impossible to withdraw them on this level (otherwise it would have been withdrawn as the simplest method to get rid of Dr. Kobre). The 13 June 1951 military order authorizing Dr. Kobre in § 1 as attorney in Berlin and granting him in §2 the status of Berlin Allied Forces Member was an order by General Handy, the Commander of HQ USEUCOM, the highest military authority in Europe. Headquarters US

report of 12 May 1955 as evidence that the deceased's status persisted after the end of HICOG and its courts (in addition to the other evidence material in enclosures 38, 44, 52-55).

114. Further evidence that Kobre's status continued in 1955 and that Berlin Command and HQ US Army Europe knew this, also that their insisting that he had no status was only a pretense in order to make him uncertain about his status and leave Berlin, can be found in the records of a hearing in 1963 before the Air Force Board for the correction of military records, a copy of which plaintiff found in the personal documents of deceased. Photocopy of it is enclosed as enclosure 38. Dr. Kobre had applied for this hearing only because of not being permitted to continue his career as a reserve officer. He never even intended to mention the hard time he was given otherwise by the US staff in Berlin, as this had nothing to do with his status as a reserve officer which was the reason why he had applied for the hearing. However very quickly the board questioned him on his work as attorney in Berlin (bottom of p. 11 (MR. CUNNINGHAM: Were you a civilian attorney, at that time practicing in Germany?) to p. 15 when Dr. Kobre got back to his problems in the Air Force Reserve (To Mr. Cunningham: May I come back to your question, sir?)) and on his Allied status. Without Dr. Kobre coming close to mentioning his status as Allied Forces Member there comes out of the blue the board's question on it (p. 51: MR. WHALAN: "… I have gained a distinct impression that security was really not the problem in your case. There appeared to be quite a bit of confusion with respect to problems you must have had repeatedly, apparently, concerning your Allied Force Member status. What was this difficulty? – THE APPLICANT: I'm not aware of any such problems. – MR. WHALAN: Not aware of such problems. – THE APPLICANT: No, sir  I was a member of the Allied Forces without question

until July of 1955; and I contend that I am technically still a member of the Allied Forces, although the High Commission [US Mission, Berlin=US occupation government] says I am not…"). This part of the records evidences the existence of the Allied Forces Member status of the deceased at least still at the time of the hearing in 1963. It evidences further that the file on Dr. Kobre that the board drew on for its questions contained material on the 'difficulties' the deceased was given in Berlin by US officials concerning his status - because it still existed and not because it had expired (notice the board's expression 'your Allied Force Member status' and not 'your alleged/your former/your then Allied Force Member status' or 'did you possess an Allied Force Member status at a certain time?' etc.). Plaintiff submits this record material as evidence for Dr. Kobre's status after 1955 (in addition to the other evidence in enclosures 37, 44 and 52-55).

**Enclosure 38: records of hearing of 1963 Air Force Board**


Berlin US Command Letters of 1955 and US Mission, Berlin letter of 1957

115. With three letters, two of 1955 from the legal section of US Command, the military unit in Berlin and a third letter of 1957 from the US Mission, Berlin (read: US HICOG/US occupation government of Berlin) a "foundation stone" was laid for "documentary proof/evidence" that Dr. Kobre's status had ended. The US Mission, Berlin [US occupation government] later always referred to them when answering inquiries from Berlin on the status of Dr. Kobre. These answers usually said that because of these letters from US Command in 1955/because of the letter from the US Mission, Berlin in 1957 the status can be regarded as terminated.

116. The two letters of 1955 are from US Command, the military unit in Berlin, to Dr. Kobre. The first is dated 22 June 1955 (enclosure 39). In it the writer, a Berlin Command general staff officer, Lt Col G. R. McLaughlin, informs Dr. Kobre of a HICOG policy directive G-5 accrediting civilian attorneys for logistical support having been rescinded (because of the end of the High Commission in West Germany) and orders the recipient to turn license plates and registration certificates for privately owned vehicles in to the Vehicle Registration Branch by 30 June 1955. Photocopy of the letter is enclosed as enclosure 38.

**Enclosure 39: photocopy of letter from US Command, Berlin of 22 June 1955**

117. The second 1955 letter from US Command was also written by Lt Col G.R. McLaughlin and is dated 8 July. We learn from it that Dr. Kobre had addressed a letter dated 30 June 1955 to General Honnen, the then Berlin US Sector Commandant. This letter the plaintiff does not possess but as the 8 July letter is an answer to it one can conclude from it that Dr. Kobre explained in the 30 July 1955 letter that his right to have a tax-free car was in his case not logistical support but part of his status as Berlin Allied Forces Member, as which he was exempt from any German taxation including taxation on private vehicles, which status continued for the duration of the occupation of Berlin. That is he made it clear that he did not have to turn in his license plates and registration certificates for his privately owned car. This letter General Honnen had forwarded to Lt Col G.R.McLaughlin to be answered who without commenting on what Dr. Kobre had explained in his letter again designates Dr. Kobre's rights as 'logistical support', and further connects the presence of American civilian attorneys in Germany with HICOG and its courts claiming that because of the dissolution of HICOG "there would not appear to be adequate

justification for continuing to consider civilian attorneys as essential to the interest of the United States."The letter is enclosed as enclosure 40.

**Enclosure 40: photocopy of letter from US Command, Berlin of 8 July 1955**

118. Dr. Kobre, being an expert on occupation law and US military law, knew that whatever had happened in connection with the changes in West Germany could have had no impact on his 13 June 1951 EUCOM-order. He further knew that the US Command letters of 22 June and 8 July 1955 (enclosures 39 and 40) themselves had no directive power. So he remained in Berlin and continued as before, considering his admission as attorney and his 'certification' as an Allied Forces member  still valid. As to his activity as a US lawyer for the forces during the years after 1955 see the material in enclosure 41.

**Enclosure 41**

119. The third letter, a letter of the US Mission, Berlin (read: US Berlin High Commission/US occupation government) is dated 29 May 1957. In this letter Mr. Grover W. Penberthy, legal adviser to the US Mission, Berlin, confines himself to the question of Dr. Kobre's Allied Forces Member status ("I refer to your letter of January 9, 1957,…, and confine this letter to your claim with respect to being a member of the Allied Forces."), expressing his opinion that Dr. Kobre had been informed in the letter of 8 July 1955 of the cancellation of that status, that is of his (Kobre's) status as a Member of the Allied Forces ("Your membership in the Allied Forces, as provided in Allied Kommandatura Law No 2 for the purposes of occupation legislation, accordingly was terminated with effect of July 31, 1955"). The letter is enclosed as enclosure 42.

**Enclosure 42: certified photocopy of letter of US Mission, Berlin of 29 May 1955 as submitted by the US Mission in the criminal trial together with a copy that Dr. Kobre received**

120. Kobre's answer of 24 June 1957 to this letter explains that nothing had occurred in 1955 which would have led to the automatic cancellation of his Allied Forces Member status and that it had not been withdrawn. Having been granted in a military order it was subject to US law such orders were subjected which was US military law and could therefore only be withdrawn by a military order issued by an officer of at least the same rank as the one who had issued the original military order, which, as his 13 June 1951 authorization had been by the order of General Handy, the Commander of HQ USEUCOM means that it could only be withdrawn by the order of the Commander of HQ USEUCOM. The letter is enclosed as enclosure 43.

**Enclosure 43: photocopy of letter of Kobre of 24 June 1957**

121. Neither the letters of Berlin Command of 22 June and 8 July 1955 nor that of the US Mission, Berlin of 27 May 1957 mention any connection possibly existing between Dr Kobre's status in Berlin and HQ USEUCOM, or mention or refer to his 13 June 1951 authorization by virtue of which the status had been granted (in § 2) which authorization was a military order by the Commander of HQ USEUCOM.

122. It was only in June 1977 that as a result of the 'Freedom of Information Act' and 'Privacy Act' of 1976 Dr. Kobre could get copies of his file in Washington, D. C. The requested copies contained a copy of a letter dated 17 April 1957 from the US Mission, Berlin to its superior, the Chief of the US Mission, Germany, Mr Henry F. Waldstein, in which the US Mission, Berlin,

asks the Chief of the US Mission in Germany to end Mr. Kobre's status as Allied Forces Member in Berlin: "I believe it would be appropriate for you [Mr. Waldstein] to make the final decision on the present status of Mr.Kobre.". Mr.Waldstein answered in an office memorandum (official standpoint of a superior on one particular issue) of 24 April 1957 (enclosure 44):

"2. I regret to say that we cannot agree with the view that the cancellation of HICOG Policy Directive G-5" terminated Kobre's status as a certified person in Berlin, ... the Directive [HICOG Policy Directive G-5] was mererly an internal policy document. It was cancelled as obsolete because the High Commissioner's office was terminated and the admissions to practice in the Federal Republic ended with the end of the occupation of the Federal Republic.

3. We are thus of the opinion that Mr. Kobre continues to be a person certified by EUCOM as necessary for the occpation. Whether this status should be continued or changed is a matter for the military authorities to decide and for the Sector Commandant to certify (Article I (3)(e) of AK Law No 2). Such decision, we think, will depend on whether Mr. Kobre's presence is considered necessary for the purpose of giving legal assistance to occupation personnel in Berlin, before court martials or otherwise."

**Enclosure 44: certified photocopy of copy of Office Memorandum of Chief of US Mission of 17 April 1957 in the files of the criminal suit, handwritten note top is presiding judge's stating that original was submitted on 4 May 1987 (see also enclosure 34: certified copy of minutes of 4 May 1987 stating this submission)**

123. It was only in June 1989 that Dr. Kobre was sent a copy of his 13 June 1951 authorization by the US Mission, Berlin among copies of documents he had asked them for. Now that he was ruined by the criminal trial described below (nos 124-129 ), in which the US Mission, Berlin had given a wrong certification on his status and now that he was on the threshold of death (he died in

November of that year) the US Mission, Berlin let him know that it had been in possession of a copy of the 13 June 1951 HQ USEUCOM order all the time and also known about its value, for it had classified it as "confidential" and unclassed it now, when the ruin of the owner of the status granted in it had been attained by means of throwing him as prey to a German court by certifying he had no status. A photocopy of the copy of the 13 June 1951 HQ USEUCOM order which was sent to Dr. Kobre by the Mission in June 1989 and Dr. Kobre's letter of 15 July 1989 to the Mission commenting on this copy, which differs very slightly from the original (mistakes in copies were at that time not uncommon as copies of documents were actually copied by hand or by typing), are enclosed as enclosures 45 and 46. (With regard to Dr. Kobre's letter to the Mission of 15 July 1989 in enclosure 46 it must be explained that because of a stroke suffered by Dr. Kobre in 1981 which impaired his speech and his writing (this letter of 15 July 1989 was certainly not written by him but by a person to whom he had explained what it should contain) he had the habit of showing to his partners in speech or writing that his mind still functioned in spite of his imperfect speech or writing, which he did by recalling to his opposite number incidents from the past with details like exact date or time. That is why he mentions at the end of this letter the first and only time that he met Mr. Koblitz, legal adviser to the US Mission, Berlin, to whom he addresses the letter.)

**Enclosure 45: Photocopy of classified copy of 13 June 1951 authorization**
**Enclosure 46: letter of 15 July 1989**

Criminal proceedings 1985-1989

124. In November 1985 German institutions inquired at the US Mission, Berlin, about Dr. Kobre's status and were told that he was not a member of the Allied Forces any more. The German finance authorities then searched his flat (on Thanksgiving Day 1985 when Dr. Kobre was just leaving for Thanksgiving dinner in the American community they came and stopped him from leaving), confiscated stock worth 2.3 million German marks and threw Dr. Kobre into prison, from which he was released on parole after four weeks (on Christmas day). In the ensuing criminal trial for evading taxes for 30 years back, from 1957 to 1987, Dr. Kobre indicated his immunity as a member of the Allied forces, submitting his HICOG  (8 August 1950) and EUCOM (15 August 1950 and 13 June 1951) authorizations.

125. Because of the demonstration of Allied status and because of Allied documents having been submitted to a German court Allied Kommandatura Law No 7 came into the picture, blocking any further activity of the court: "Whenever any question as to the existence, terms, validity or intent of any order of the Occupation Authorities or Forces or as to the applicability of Articles 1 or 2 [Articles 1 or 2 of Allied Kommandatura Law No 7 exempt members of the Allied Forces from German jurisdiction] to any person or property must be decided, the German Authorities concerned shall forthwith suspend further action and refer such question to the appropriate Sector Commandant. The appropriate Sector Commandant or any Occupation Court to which he may refer such question shall issue a certificate determining it.  Such certificate shall be binding on the

German Authorities" (Allied Kommandatura Law No 7, Art. 3,2). The law is enclosed as enclosure 1.

126. The terms of the US Sector Commandant's certificate which was necessary for the court to be able to proceed in the matter were communicated by a staff member of the US Mission, Berlin [read: US occupation government, Berlin] a German national, a Miss Dorothea Bieder, whose testimony at the hearings of 23 and 27. April, 4 and 11 May 87, is summarized in the judgment (Berlin criminal court, file ref no (619) Kls 1 St Js 81/85). We quote verbatim from pp 16-17 of the translation of the judgment (enclosure 50):

"Under Law no 7 Article 1 a 1 of the Allied Kommandatura in Berlin of 17 March 1950 ... German courts may not exercise criminal jurisdiction over members of the Allied forces without the express permission, either general or granted in particular cases, of the Allied Kommandatura in Berlin or the appropriate Sector Commandant... The appellant could consider himself a member of this group only up to 31 July 1955. Under Law no 2 Art. 1 Section 3 (e) of the Allied Kommandatura in Berlin of 9 February 1950 ... this group covers persons whose presence in Greater Berlin has been certified by the Allied Kommandatura or the Commandant of one of the sectors as necessary for occupational purposes. From her knowledge of the records kept in the US Mission concerning the appellant, the witness Bieder testified that the High Commissioner informed the appellant in a letter dated 8 August 1950 that he was required as a civilian American lawyer for the American courts. He was thereby granted this status. However, the witness, an expert on these matters, testified equally clearly and unambiguously that following the dissolution of the occupation zones and military courts in 1955 the appellant automatically lost

this status and that the army's legal department, on behalf of the American Sector Commandant, had already informed him of this on 8 July 1955.

However, as the appellant had insisted on his alleged status and the associated emoluments in numerous submissions, particularly whenever a new legal adviser had started work in the US Mission, the legal department had repeated this information in a letter dated 29 May 1957…Both letters had possessed merely declaratory status, as the abolition of military jurisdiction logically entailed the end of the need for American lawyers or legal advisers at the military courts. Formal notification or other official action had not been required. The American Town Commandant [read: Sector Commandant] in Berlin had also been the sole competent authority for this declaratory statement. He had personal sovereignty. He was independent of the military and the US Embassy and all other institutions… As the appellant on the testimony of the witness Bieder was not reappointed by the US Mission or by the military, he resided in Berlin from August 1955 on as an ordinary private American citizen. He was merely noted as a private American lawyer in a list of American lawyers kept by the US Mission. He is thus also subject to German criminal jurisdiction ….Contrary to the defense's motion for adminicular evidence no expert opinion on American law (including judicial decisions) was needed to clarify the legal questions involved in this testimony. The adjudicating court had to decide these questions itself. In concurrence with the expert Bieder the court took the view that the need for American lawyers or legal advisers at the military courts automatically ended with the abolition of military jurisdiction and that the relevant letters possessed merely declaratory status."

127. The case went through all possible levels and all appeal levels which meant that five different courts dealt with it and decided on it. At that time there was no access for Berlin matters

to the German Constitutional Court (Bundesverfassungsgericht) because of Allied sovereignty in Berlin. In the appeal Dr. Kobre submitted as evidence for his view that his status could not have ended in 1955 (because of the end of HICOG and its courts in West Germany) the Waldstein-Office Memorandum of 17. April 1957 (supra no 122, enclosure 44), which again necessitated the court's suspension of further action and its referring to the Sector Commandant the question of whether the Waldstein letter had to be considered. The Sector Commandant again sent Miss Bieder to one of the hearings at the fourth level to present on his behalf the certificate that the Waldstein letter did not have to be considered. But on 22 February 1989 the court asked in a letter for a further opinion of the US Mission, Berlín, on the Waldstein letter of 24 April 1957, to which the Legal Adviser to the US Mission, Berlin, Mr. Donald Koblitz answered with a written certificate under the same date, without mentioning the Waldstein letter, that the letters of 20 June and 8 July 1955 meant the end of Dr. Kobre's status. The court's inquiry to the US Mission and the US Mission's certificate, both of 22 February 1989, as they are in the court file are enclosed as copies as enclosures 47 and 48 (the latter in certified copy and with translation into English).

**Enclosure 47: court's inquiry of 22 Feb 1989** with translation
**Enclosure 48: US Mission's letter of 22 Feb 1989 with translation**

128. The certificate of the US Mission as it appears in the judgment mentions neither the certificate of the Chief of the US Mission in Germany, Mr. Waldstein, on Mr. Kobre's status in the 'Waldstein Office Memorandum' of 24 April 1957 (enclosure 44) nor the military order of HQ USEUCOM 13 June 1951 by virtue of which Dr. Kobre was a Member of the Berlin Allied Forces, though the record of the trial shows that both documents were part of the evidence in

court and as such the subject of discussion in nearly all the hearings. Referred is to enclosure 34, containing a certified photocopy of p. 32 of the record of the trial, which is taken from the hearing of 4 May 1987. The relevant part of the record mentioning the "24 April 1957 letter", which letter is the Office Memorandum of 24 April 1957 of the Chief of the US Mission, Bonn, to Mr. Grover Penberthy, legal adviser, US Mission, Berlin, is at the bottom of the page. Also mentioned is the 13 June 1951 HQ US EUCOM military order. The record states that at this hearing Dr. Kobre submitted the originals of these documents which the court photocopied and which photocopies the court took to the files. The originals were returned to Dr. Kobre. A certified photocopy of the record is contained in enclosure 34, the translation into English of the relevant part is given supra no 98.

129. Dr. Kobre appealed against the judgment of 23 February 1989 sentencing him for evasion of taxes since 1957. The dismissal of the appeal did not reach him as he died in November 1989. The judgment of the Berlin criminal court, file no (519) Kls 1 St Js 381/85 (9/88) of 23 February 1989, together with a translation into English, is enclosed as enclosure 50.

**Enclosure 50: judgment file no (519) Kls 1 St Js 381/85 (9/88) of 23 Feb 1989 with translation**

<u>Civil proceedings 1985-1998 and their judgments violating the law of nations and a treaty of the United States</u>

128. Parallel to the criminal trial the Berlin-Zehlendorf revenue authorities filed civil suits in 1987 involving tax assessments for the years 1957-1987 and later, in 1989, tax assessments for the years 1988-1989 against Dr. Kobre, which he challenged. The challenges opened further taxation proceedings, in this case a civil suit in which independently of the result of the criminal trial the matter would be judged anew according to the evidence. In parallel proceedings one of the cases is kept pending until the other is decided and this was done here with the civil suit being kept pending. When the judgment on the criminal case was passed in written form two months after the death of Dr. Kobre, the civil suit in the Berlin Fiscal Court had only been filed, but not yet heard and was still completely open. On 19 September 1991 it was established that his only child Harold William Gutch (* 3 January 1977) was the sole legal successor of Dr. Kobre.

129. Being convinced that it could be proved that Dr. Kobre's status as a member of the Allied Forces of Berlin, that is that the 13 June 1951 HQ USEUCOM military order admitting him as an attorney for occupation matters in Berlin and certifying him in paragraph 2 as being necessary for the purposes of the occupation, had not ended in 1955 either by virtue of the letters of 22 June or 8 July or by virtue of any changes in 1955 in West Germany, such as the end of HICOG (High Commission of Germany) there together with its courts, the plaintiff's mother resumed the action in the name of the under-age plaintiff, who at the time of his father's death was only 13 years old.

130. While the deceased had had no immediate access to HQ USEUCOM but had to keep to official channels, which ran via the US Mission, Berlin, which blocked any of his attempts to reach HQ USEUCOM for a certificate concerning the validity of his 13 June 1951 HQ USEUCOM order (see enclosure 51: letter of US Mission, Berlin to Mr. Kobre of 9 May 1977 which illustrates the channels: "I am referring your claim to USAREUR [USAREUR:US Army Europe, military unit superior to Berlin but inferior to HQ USEUCOM]" (page 2)), the plaintiff could turn directly to the Judge Advocate General of HQ USEUCOM. In a letter of 30 November 1992 (enclosure 52) this unit stated that its 13 June 1951 military order was to remain valid on its own terms for the duration of the occupation of Berlin ("The authorization was to practice law for the duration of the occupation which ended in Berlin a little over two years ago.") and further that it could only be withdrawn by the Commander HQ USEUCOM or by his military order ("The only appropriate authority who could have ended the authorization would have been either the Commander HQ USEUCOM or a person at a lower military echelon exercising power on the Commander's behalf"). In a letter of 18 February 1993 (enclosure 53) HQ USEUCOM stated that the letters of 22 June and 8 July did not and could not withdraw whatever had been granted in the 13 June 1951 EUCOM order. The letter reads: "With regard to these letters [22 June and 8 July 1955], they did not and could not withdraw the authority granted by HQ USEUCOM for Mr. Kobre to practice law since LTC McLaughlin [staff officer who signed those letters] was not dealing with authority to practice law and was not writing the letters on behalf of the Commander, Headquarters, United States European Command.". A letter of 23 February 1995 (enclosure 54) deals in particular with the question of Dr. Kobre's status as a member of the Allied Forces, referring especially to the letter of the US Mission, Berlin of 29 May 1957 as this

letter confines itself to dealing with the question of Dr. Kobre as an Allied Forces member ("I ... confine this letter to your claim with respect to being a member of the Allied Forces", letter of 29 May 1957) and referring also especially to the Waldstein memorandum of 24 April 1957, as this also devoted itself to the question of Kobre's Allied Forces Member status. The HQ USEUCOM letter of 23 February 1995 concludes that in 1957 the Chief of the US Mission in Bonn expressed the view that Mr. Kobre's Allied Member status was still valid and that from that time on there was no indication that it had ever been withdrawn. This letter reads in parts: "This office reaffirms that the status granted in paragraph 1 of the letter dated 13 June 1951 by command of the Commander, Headquarters, United States European Command (HQ USEUCOM) could not be withdrawn by the letters of 22 June and 8 July 1955 and 29 May 1957. -- With reference specifically to the 29 May 1957 letter signed by the Legal Adviser, U.S. Mission, Berlin, the following comments pertain. – As we mentioned in our letters which you reference, only the military authorities (in this case HQ USEUCOM) could withdraw Mr. Kobre's status. In other words, the U.S. diplomatic authorities did not have jurisdiction over such matters because of the occupation status of Berlin. This point was recognized by the U.S. Government on May 7, 1955, when the occupation ended in West Germany." There was a further letter of HQ USEUCOM of 20 March 1995 to the same effect (enclosure 55).

**Enclosure 51: photocopy of Letter of US Mission, Berlin to Mr. Kobre of 9 May 1977**
**Enclosure 52: certified photocopy of Letter of 30 November 1992 of HQ USEUCOM**
**Enclosure 53: certified photocopy of Letter of 18 February 1993 of HQ USEUCOM**
**Enclosure 54: certified photocopy of Letter of 23 February 1995 of HQ USEUCOM**
**Enclosure 55: certified photocopy of Letter of 20 March 1995 of HQ USEUCOM**

131. The plaintiff demonstrated in court that the evidence of the criminal trial for an alleged automatic end of the deceased's status because of the end of the occupation of the Federal

Republic, the letters of 22 June and 8 July 1955 of US Command, Berlin and the letter of 29 May 1957 of US Mission Berlin, and the corresponding statements of the US Mission, Berlin/US Sector Commandant, Berlin, via its representative in court, Miss Bieder, proved meaningless in the light of the new evidence, the statements of HQ USEUCOM of 30 Nov 1992, 18 February 1993, 23 February 1995 and 20 March 1995. These letters from the legal section of the very authority which had granted the status confirmed that the status had not automatically ended in 1955 with the end of the High Commission of Germany and its courts and that there was no indication that it had ever been withdrawn and so now the whole evidence was diametrically opposed to that of the criminal trial. This new evidence coming from the legal section of a military authority superior to any in Berlin, including the Berlin US Sector Commandant overruled the US Sector Commandant's earlier certificate (presented by legal adviser Miss Dorothea Bieder at the criminal trial) that the status of the deceased had ended automatically in 1955. In other words, had the letters of HQ USEUCOM in enclosures 52-55 already existed during the period of the occupation of Berlin, their view that the status had not ended in 1955 would have been binding on the US Sector Commandant or his office, the US Mission, Berlin. This view of HQ USEUCOM coming now from an authority superior in the hierarchy to the US Sector Commandant, was accordingly – as there was no Sector Commandant any more – the"Sector Commandant's certificate"on the status of Dr. Kobre as required by Allied Kommandatura Law No 7, Art. 3,2, which view was according to the same law "binding for German authorities". Allied Kommandatura Law No 7, Art. 3,2 provides:"Whenever any question as to the existence, terms, validity or intent of any order of the Occupation Authorities or as to the applicability of Articles 1 or 2 of this law [which articles exempt Members of the

Allied Forces from German jurisdiction] must be decided, the German Authorities concerned shall forthwith suspend further action and refer such question to the appropriate Sector Commandant...[whose] certificate determining it shall be binding on the German Authorities"

132. The certificates of the Chief of the US Mission in Germany, Mr. Henry F. Waldstein, in his "Office Memorandum" of 24 April 1957 (enclosure 44) and that of the Commander of HQ USEUCOM, in the official statements of his legal section (enclosures 52-55) – both agree in their expert opinion on the Berlin Allied Forces Member status of Mr. Kobre and prove that it had not ended in 1955. Concerning the authority of the two, they were the highest American civil and military authorities in all Europe. We refer to enclosure 54 and its attachment, the Executive Order 10608 of the President of the United States of 7 May 1955 determining the authority of the two:

"2. The Chief of the United States Diplomatic Mission to the Federal Republic of Germany, hereinafter referred to as the Chief of Mission, shall have supreme authority, except as otherwise provided herein, with respect to all responsibilities, duties, and governmental functions of the United States in all Germany. The Chief of Mission shall exercise his authority under the supervision of the Secretary of State and subject to ultimate direction by the President. 3. The United States Military Commander having area responsibility in Germany, hereinafter referred to as the Commander, shall have authority with respect to all military responsibilities, duties, and functions of the United States in all Germany, including the command, security, and stationing of United States forces in Germany, the assertion and exercise of their rights and discharge of their

obligations therein, and emergency measures which he may consider essential for their protection or the accomplishment of his mission."

These two authorities agree in their view that the status of Mr. Kobre as an Allied Forces Member continued after 1955. Their opinion in this respect was "the Sector Commandant's certificate" on the matter and was binding for the court.

133. The criminal trial which precedes the civil suit contains, as it took place during occupation times, the US Sector Commandant's certificate on the legal route that had to be taken in the case. This certificate is quoted verbatim above in no 126 and runs in short as follows: 'If a US citizen living in Berlin is a Member of the Berlin Allied Forces Allied Kommandatura Law No 7, Art. 1 or 2 applies and no German jurisdiction can be exercised – if he is not, German civil or criminal law applies and German jurisdiction is given.' As the Sector Commandant stated that Dr. Kobre's Allied status with which he had been within the protection of Allied Kommandatura Law no 7 had ended, Dr. Kobre was sentenced in the criminal trial like a civilian according to German law. Now, in the civil suit, the evidence was that the status could not have ended automatically and there was no indication that it had been withdrawn, in other words that Dr. Kobre possessed it until he died. The deceased could therefore not now be judged as a civilian with no military status – which means according to the US Sector Commandant's earlier certificate that only Allied Kommandatura Law No 7 was left to apply. The only logical conclusion the court could arrive at as there exists the US Sector Commandant's certificate for the preceding trial concerning the only legal route to take, was that as according to the evidence in this suit Dr. Kobre obviously was a Member of the Berlin Allied Forces until his death, no German jurisdiction could be exercised

precedents supra no 57-61 prove the validity of Allied Kommandatura laws as long as the occupation lasted. As Allied Kommandatura Law No 7 was valid, it prevailed over any German law inconsistent with it, that is there was no option for a German court or for the European Court of Human Rights not to apply it whenever a case within its purview was brought before them. The judgments however reject it and therefore they all violate Allied Kommandatura Law No 7, Art. 3,1 which runs: "No German Court shall render a decision which impeaches the validity or legality of any legislation, regulation, directive, decision or order published by the Occupation Authorities." According to Allied Kommandatura Law No 7, Art. 4,1 the decisions are null and void: "All proceedings and every decision taken by a German court on any matter excluded from its jurisdiction shall be null and void."

148. Of the various reasons for which the judgments of the Berlin Fiscal Court, file no V 355/87, of the German Federal Fiscal Court, file no I B 28/94 and the ruling of the European Court of Human Rights are null and void it suffices to name only these three: no Allied consent had been obtained for these proceedings, the question of Allied status is considered as meaningless and they all reject Allied occupation law in favor of the NATO Status of Forces Agreement. The courts had no authority for such decisions.

and Allied Kommandatura Law No 7 applied. The first step according to Allied Kommandatura Law No 7, Art. 3,2 would have been for the court to "forthwith suspend further action and refer such question [if it had jurisdiction or if it had to lay down this case for lack of jurisdiction] to the appropriate Sector Commandant [as his office had been abolished, to the US embassy]". This legal view has been expressly confirmed to the plaintiff by the two most renowned German experts on Berlin occupation legislation, Professor Dr. Dieter Schröder and Professor Dr. Albert Randelzhofer. At any rate no German jurisdiction could then be exercised and can still not be exercised in this case.

134. Instead the court exercised jurisdiction and dismissed the plaintiff's challenge of the tax assessments by falling back first on the results of the investigation of the criminal trial according to which the deceased had had no Berlin Allied Forces Member status since 1955, suppressing thereby the new and contrary evidence, the letters of the legal section of HQ USEUCOM (enclosures 52-55) which had rendered invalid the results of the criminal trial. In addition to this it did not apply the legislation which the criminal suit had applied and which had been indicated in that suit by the US Mission to be obligatory in this case but fell back on the provisions of the NATO Status of Forces Agreement which did not extend to Berlin, thereby admitting that the person being dealt with must be a forces member. In other words it reminds as a first step that the investigation of the criminal trial had proved that the deceased had no military status and then, as a second step it judges the whole matter on the basis of an international military agreement, that is it judges the deceased as a military. But to apply this military agreement to a Berlin Allied

Forces Member is illegal. In view of Allied Kommandatura Law No 1, articles I, II, IV, V and

VII, it is perversion of law. These articles provide

"I. All legislation enacted by or under the authority of the Allied Kommandatura or a

Commandant of any of the Sectors of Greater Berlin shall be published in the official Gazette of

the Allied Kommandatura,

II. All persons in Greater Berlin shall be deemed to have notice of the texts published in the

Official Gazette of the Allied Kommandatura,

IV. It shall not be a defense to any prosecution or proceeding arising out of the failure to obey or

fulfill such legislation that the official text was not understood or that the German translation

thereof was inaccurate or incomplete,

V. A copy of the Official Gazette of the Allied Kommandatura shall, when produced, be evidence

in all Courts and for all purposes of the due enactment and tenor of any legislation published

therein,

VII. All German authorities shall take the Official Gazette of the Allied Kommandatura and make

it available to their staff and to the public."

The judgment of the Berlin Fiscal Court file ref no: V 355/87, of 28 September 1993, together

with a translation is enclosed as enclosure 56. Allied Kommandatura Law No 1 is enclosed as

enclosure 57.

**Enclosure 56: certified copy of judgment Berlin Fiscal Court file ref no V 355/87 and
translation
Enclosure 57: Allied Kommandatura Law No 1**

135. By falling back on the NATO Status of Forces Agreement the judgment not only applies an

agreement not valid in Berlin, thus rendering a misjudgment, but also applies this agreement so

contrary to its sense that even if it had been valid in Berlin and could have been legally applied to the case the outcome would still be a misjudgment. The NATO Status of Forces Agreement provides in Art. X, 2: "Nothing in this Article shall prevent taxation of a member of a force or civilian component with respect to any profitable enterprise, other than his employment as such member, in which he may engage in the receiving State, and, except as regards his salary and emoluments and the tangible movable property referred to in paragraph I, nothing in this Article shall prevent taxation to which ... such a member is liable under the law of that State".

This passage means no more than that if the foreign forces member or civilian component takes a job in the receiving state in his spare time ["in other than his employment as such [forces] member or civilian component"], the receiving state can levy taxes on the earnings of the foreign forces member in such a job (but only in that). A typical example of such income would for instance be the earnings of a foreign forces member as a waiter or bartender in the receiving state in his spare time, as a musician or member of a band, an interpreter or translator, etc. Not subject to the taxation of the receiving state are the salary and emoluments paid to the forces member as such or if it involves a civilian component of the forces what this individual earns by furnishing needed services to the forces, nor the tangible movable property of the foreign forces members or civilian component of the forces.

136. Had the NATO Status of Forces Agreement applied to Berlin it would have meant in the case of Dr. Kobre that the court would have had to investigate each source of his income in order exercise jurisdiction on the income of the deceased earned **not** in his capacity as a forces member and **not** with stock, but earned in spare-time employment in the receiving state. Dr. Kobre's

income flowed from only two sources, his earnings as an attorney in Berlin and his earnings on stock, and both would not have been within German jurisdiction: his authorizations as American attorney in Berlin for occupation matters were not granted by Germany, it was indeed impossible for German authorities to admit a foreigner with a degree from a foreign law school as an attorney in Germany, but were granted by HQ USEUCOM and the High Commission of Germany, that is he was admitted as a US attorney in Berlin by the government of the United States in its capacity as occupation power in Berlin, and as his Allied Forces Member status was granted exclusively in connection with his activity as a US attorney admitted by the US occupation power, that is also by the US government, whatever he earned as such an attorney admitted by his government was income earned as a forces member which income was not within the authority of the taxation of the receiving state. Because even if he advised or represented Germans or Berliners, for instance because they had offended against the Allies' prohibition in Berlin to possess weapons, or even if he advised civilians in US civil law, for example because they were pursuing a matter in a court in America, such an activity of his would be "pursuant to and in accordance with all the provisions of EUCOM Letter, AG 250.44 JAG-Ago, 16 October 1950", that is it would be activity within the realm of his capacity as Member of the Allied Forces. His income on stock would even then – had the NASTO Status of Forces Agreement applied to Berlin - probably also have been no business of the German authorities', for stock documents could be counted as income on "tangible movable property", like for example bank assets, and such income of a foreign forces member or civilian component was also exempt from the jurisdiction of the receiving state.

137. The judgment however interprets Article X, 1 and 2 of NATO Status of Forces Agreement to mean that if a foreign forces member is not "solely" present in the receiving state as such a forces member, which is the case if he practices a spare-time job not connected with the foreign forces, then this foreign forces member is subject to the taxation of the receiving state with all his income (and not just with the income earned in a spare-time job). As the court assumes without investigation income of the deceased outside his capacity as a forces member it subjects as a consequence his whole income to its taxation. This is the judgment's application of this agreement: "Article X of the NATO Forces Statute, … cannot affect the decision regarding full tax-liability, as the application of this regulation, which precludes taxation under German law, presupposes that "a member of a force or its civilian support is on the territory of this state solely in this capacity" ". (p 03 of translation of judgment, enclosure 48) -  "The continuance of the deceased's "Allied status", as claimed by the plaintiff, is legally immaterial, as even if this status did remain unchanged Dr. Kobre (as already noted) was certainly not resident in Germany "solely in this capacity"." ( p 04 of translation of judgment, enclosure 48).

138. The judgment violates Allied Kommandatura sovereignty by not observing Allied Kommandatura Law No 7 which as occupation law has to be observed as it takes precedence over any other local law. "To the best of our knowledge" says the legal section of HQ USEUCOM (letter of 30 Nov 1992, enclosure 52) the status of Dr. Kobre "was not terminated prior to the ending of the occupation [of Berlin]" and as it had not expired automatically ("The authorization was to practice law for the duration of the occupation which ended in Berlin a little over two years ago", same letter of 30 Nov 1992, enclosure 52), it continued until its bearer's

death. As Dr. Kobre was a Berlin Allied Forces Member until his death in 1989 the retroactive

tax assessments against his estate violated Allied Kommandatura Law No 7, Art. 2 providing:

"Except when expressly authorized, either generally or in specific cases, by the Allied

Kommandatura or the appropriate Sector Commandant, German Courts shall not exercise

jurisdiction in any non-criminal case (a) in which any of the parties is within the purview of

Article 1 (a) [Article 1(a) forbids jurisdiction on Allied Forces Members]; (b) in which the issues

to be decided include any matter arising out of or in the course of performance of duties or

services with the Allied Forces; (c) in which the issues to be decided may affect the right of

control of any Power in Occupation."

139. As the judgment does not observe Allied Kommandatura Law No 7, Art. 1 and 2, and the

Sector Commandant's certificate in the preceding trial on the only legal route, it also violates

Allied Kommandatura Law No 7, Art. 3,1: "No German Court shall render a decision which

impeaches the validity or legality of any legislation, regulation, directive, decision or order

published by the Occupation Authorities". Further as the court did not suspend further action

when the plaintiff submitted new evidence for the continuation of the Allied status of the

deceased and did not refer the question of how to proceed in the case to the United States

embassy and as it did not wait for the US government to decide but decided independently

though it had no authority to do so, Art. 3,2 of this law is also violated which provides:

"Whenever any (literally 'any') question as to the existence, terms, validity or intent of any order

of the Occupation Authorities or Forces or as to the applicability of Articles 1 or 2 of this Law to

any person or property must be decided, the German Authorities concerned shall forthwith

suspend further action and refer such question to the appropriate Sector Commandant. The

appropriate Sector Commandant or any Occupation Court to which he may refer such question

shall issue a certificate determining it. Such certificate shall be binding on the German Authorities." Further Art. 8 of this law is violated which provides: "In cases outside the jurisdiction of German Courts under this Law, no German Authority may, except when expressly authorized either generally or in specific cases by the appropriate Sector Commandant, impose any penalty or coercive measure of any description."

140. Therefore Art. 4,1 of Allied Kommandatura Law No 7 is triggered rendering the judgment null and void: "All proceedings and every decision taken by a German Court on any matter excluded from its jurisdiction shall be null and void."

141. The plaintiff applied for appeal against the judgment to higher courts. The German Federal Fiscal Court decided on 18 October 1994, file ref I B 27/94, "The petition of the plaintiff concerning non-admission of appeal against the judgment of Berlin Fiscal Court V 355/87 of 28 September 1993 is dismissed as unfounded." In its argumentation it expressly rejects "American occupation law" in favor of the NATO Status of Forces Agreement, designates the certificates of the legal section of HQ USEUCOM in the letters of 30 November 1992 and 18 February 1993, (enclosures 52-53), which authority was and still is the highest military authority in Europe and was with respect to occupied Berlin no less than the highest occupation authority in Europe, as "certificate ... of irrelevant issue" and the status of the deceased as Berlin Allied Forces Member as "member of the American NATO forces" and this status it declares as "legally immaterial". On the one hand it does not recognize a difference in status between the NATO forces in West Germany and the Allied Forces in Berlin and on the other hand it declares NATO agreements

superior to "American occupation law" and to the "regulations of the Allied Kommandatura",
translation of decision of Federal Fiscal Court, p 02:

"1. ...only the NATO Status of Forces Agreement and not, for instance, American occupation
law is immediately applicable. The issue of any certificate attesting otherwise by the NATO force
concerned is irrelevant. 2. a) The Fiscal Court based its original decision on this legal position.
Precisely for this reason it saw no occasion to obtain an expert opinion on whether the testator
was a member of the American NATO forces [sic] up to his death. In the opinion of the Fiscal
Court this question was legally immaterial. The Fiscal Court likewise saw no occasion to obtain a
legal opinion on American occupation law. On the basis of its legally correct view the Fiscal
Court had to interpret only the NATO Status of Forces Agreement as such, not American
occupation law. The NATO Status of Forces Agreement had to be interpreted according to its
ordinary sense as applicable with its regulations in their context and in the light of its aim and
purpose... c) The Fiscal Court (on the basis of its overall legal view) furthermore had no reason
to consider the regulations of the Allied Kommandatura. These regulations apply to non-German
persons only if their presence in Berlin is confirmed as necessary for occupation purposes by the
Allied Kommandatura or by one of the Sector Commandants. Neither the testator nor the plaintiff
and petitioner (plaintiff) submitted such a confirmation for the period from 1957 on in the present
dispute. They did not even demonstrate the necessity of the testator's presence in Berlin for
occupation purposes. In view of these facts the Fiscal Court was entitled to assume as the normal
state of affairs that a person who draws no emoluments from a foreign NATO force and is not a
member of its civilian support is present in this country for personal reasons if he engages in
advisory work and administers his estate here."

The decision is enclosed with translation as enclosure 58.

**Enclosure 58: certified copy fo decision of German Fiscal Court, file ref: I B 27/94 and translation**

142. As this decision is null and void because of its application of the NATO Status of Forces Agreement and the non-observance of Berlin occupation legislation (Allied Kommandatura Law No 7) it need not be further discussed. It should only be mentioned that firstly, the questions it decided were of the kind that the Allied Kommandatura had ordained in Allied Kommandatura Law No 7, Art. 3,2 not be decidable by a German court. Secondly, necessity itself is irrelevant according to the provisions of Allied Kommandatura Law No 2, Art. I (3) (c), for the law is very clear on this particular point stipulating "XY is **certified** to be necessary for the purposes of the occupation", and not "XY is necessary for the purposes of the occupation". Even assuming that Dr. Kobre was at some stage less necessary in Berlin than at other times or even not necessary at all, such a fact would not have dissolved his status ('certified') (apart from the fact that a German court has no right to demand such evidence as it has to suspend further action and turn the question over to the US government for the decision as soon as such a question crops up).

Thirdly, the plaintiff had – contrary to the decision's opinion, the court obviously had not bothered to look at the evidence - submitted confirmation by the two highest United States Authorities in Germany that the status of the deceased continued after 1957. The one, the legal section of HQ USEUCOM, confirmed in its letter of 30 Nov 1992 that "The authorization [containing in para 2 the granting of Allied Forces Member status] was to practice law for the duration of the occupation which ended in Berlin a little over two years ago"(enclosure 52). The other, the Chief of the US Mission in Germany, Mr. Henry F. Waldstein, had certified in his

Office Memorandum of 14 Apr 1957 "3. We are thus of the opinion that Mr. Kobre continues to be a person certified by EUCOM as necessary for the occupation" ('continues' in a letter of 1957 means that the status would remain beyond 1957, see supra no 122, enclosure 44). And fourthly, the plaintiff had proved the necessity of the deceased for the forces by submitting evidence of his activity as an attorney for the Berlin US forces until shortly before his death (see enclosure 41). As the deceased's assistance in his capacity as US attorney for occupation law and matters was sought in particular by the American community in Berlin and also occasionally by Berliners and even by West Germans then obviously he was needed as such attorney or furnishing needed services as such.

143. The plaintiff then appealed to the German Constitutional Court which ruled on 15 August 1996 that it would not decide on the matter. The ruling of the German Constitutional Court file ref 2 BvR 456/95 is enclosed in certified copy with translation as enclosure 59. His appeal to the European Commission on Human Rights was turned down with a ruling of 26 October 1999, application no 35530/97, on the commission's finding that as it "is primarily for the national authorities to interpret and apply domestic law … it is irrelevant … that in the present case part of the law to be applied by the national authorities was of international origin." The decision is enclosed in copy as enclosure 60. This ruling does not recognize the Four-Power status of Berlin nor that of the Allies in Berlin (supreme authority), in other words does not recognize that firstly there is no legal way in occupied Berlin to levy taxes on an Allied Forces Member because there is simply no law and no German jurisdiction for this and secondly that the law by means of which the judgments in question pulled a Berlin Allied Forces Member within its jurisdiction, the

NATO status of Forces agreement, was not domestic law in occupied Berlin, further that the

plaintiff did <u>not</u> claim that it was due to the 'international origin' of the NATO Status of Forces

Agreement that this agreement did not apply to Berlin but that he claimed that because of the

occupation status of the city and the Allies' supreme authority there it did not and could not apply

at all as long as the city's occupation lasted. For the NATO Status of Forces Agreement is a

military agreement and an occupied territory has at all times been disarmed territory which means

it cannot enter into a military agreement, especially not with its occupier – in which the

occupier's rights are limited! [As to the 1994 tax notice for which allegedly the domestic

remedies had not been exhausted, a "shortcut" according to the European Commission's own

provisions was used.] The status of Berlin was very well recognized by the Commission in the

ruling of 28 May 1975, application no 6231/73, Ilse Hess versus United Kingdom (supra no 61,

enclosure 25)). Its conclusion (end of decision, p 176) refers to Spandau prison but as Berlin

status experts, for example Professor Albrecht Randelzhofer, state, is meant to apply to Berlin

generally and runs: "The supreme authority over the prison was vested in the Allied

Kommandatura., ...the responsibility for the prison at Spandau...is exercised on a Four Power

basis ... [one of the partners] acts only as a partner in the joint responsibility, which it shares with

the three other partners. The Commission is of the opinion that the joint authority cannot be

divided into four separate jurisdictions and that therefore the United Kingdom's participation in

the exercise of the joint authority ... is not a matter "within the jurisdiction" of the United

Kingdom."

**Enclosure 59: certified copy of decision of German Constitutional Court file ref no 2 BvR
456/95**
**Enclosure 60: copy of decision of the European Court of Human Rights, application no
35530/97**

144. The European Commission's ruling in the present case is also inconsistent with its ruling on a matter of parliamentary immunity, ECHR application no 3374/67, described supra no 62 with enclosure 26, in which it stated according to a summary in the Digest of Strasbourg Case-Law relating to the European Convention on Human Rights, Vol 1-6, 1984, p. 350: "Not the court but the defendant is inaccessible. And it is for the court to apply the corresponding limitation of its jurisdiction. "(see enclosure 24)

145. It was common in occupied Berlin for the Allies to refuse their consent for a case to be heard by a German court, which then was the end of it, as the court then had to lay down its work on the case without further ado. One such case, the case which got known as the 'Duppelfeld case' is described in the book "Judgment in Berlin"(1984), by H. Stern, on pp 340-342. On p 342 we read: "Wherever they went [with this case], the Berliners were turned away. If they went to a German court, the Americans took away its jurisdiction because of their "interest" in the lawsuit. If they went to an American court, the Americans persuaded that court to refuse to hear them because it was a purely German matter. It was plain that the occupation authorities would not permit any judicial review." See also supra no 53.

146. This Duppelfeld case could indeed not be heard anywhere in the world because the American Sector Commandant had refused to give a Berlin court his consent for them to hear the matter – as was his right according to Allied Kommandatura Law No 7, Art. 3,2. To give an impression of his authority it may be permitted to just mention some further provisions of Allied

Kommandatura Law No 7: He also could "require the production of any German Court records, files and other documents, and attend the hearing of any case in any German Court, whether or not heard in public" (Art. 6), he could "either generally or in specific cases, withdraw from a German Court any proceeding directly affecting any persons or matters within the purview of … the relationship between the Allied Kommandatura and Greater Berlin" (Art. 7,1), and he could "suspend any decision of a German Court directly affecting any of the persons or matters within the purview … of [the Allied Forces]" (Art. 7,2), he could further take such measures as he deemed "necessary for the determination of cases withdrawn from the jurisdiction of German Courts." (Art. 7, 3). An Occupation Court convened by him had the power to "(a) confirm, nullify or modify any proceeding, decision, judgment, sentence or execution order of a German Court; (b) to direct a trial or retrial of the case in a German Court." (Art. 7, 4). And "every judgment or decision of an Occupation Court in any case withdrawn from a German Court" was "binding on all German Courts and Authorities," and was not "subject to review by German Courts." (Art. 7,5).

147. The Berlin Fiscal Court judgment of 28 Sep 1993 (file ref no V355/87 and file ref no V 1/94 1986), of 15 Apr 1997 (file ref no 5580/96) subjecting the deceased by means of the NATO Status of Forces Agreement to its jurisdiction, the German Federal Fiscal Court's refusal of 14 Sep 1994 to admit appeal (file ref no I B 28/94), the rulings of the German Federal Constitutional Court of 15 Aug 1995 (file ref no 2 BvR 455/95) and of the European Court of Human Rights of 26 Oct 1999 (application no 35530/97) all approve in the present case of the laws of the Allied Kommandatura being rejected in favor of the NATO Status of Forces Agreement – though the

126

## I. Claim for Relief

149. Plaintiff has been injured by the Defendant's illegal and excessive retroactive taxation assessments against his late father who was immune to German jurisdiction and taxation, by defendant's illegal drawing in of the deceased's estate and defendant's further claim of alleged inheritance debts of plaintiff from hius father to defendant in the million. He will be irreparably harmed for his whole life if relief is not granted, financially, in his physical and mental health (depressions), in his chance to pursue a profession or to found a family, in his rights as a citizen, for example his right or possibility to have a bank account in his name or to run a business, to buy or rent a car or a house, to have a car or phone registered in his name etc., his possibility to have friends (who wants a friend who is pursued by lifelong distrain!) in short in his right to lead a normal life.  See supra nos. 52-55.

## J. Prayer for Relief

150. Wherefore, plaintiff prays for

(a) a declaratory judgment that the judgments of the Berlin Fiscal Court of 28 Sep 1993 (file ref no V355/87 and file ref no V 1/94 1986), of 15 Apr 1997 (file ref no 5580/96) and the approval of the higher courts of these judgments are in view of their violations of Allied Kommandatura Law No 7, Art. 2 (a)(b) and (c); 3 (1) and (2) and Art (8) according to Art. 4(1) of this law null and void.

(b) the judgment against defendant in excess of US $ 15, 000, 000 as follows:

(b,1) for the roughly US $ 7,000,000  the estate of the deceased drawn in 1985 amounts to

today with the interest of the 20 years since its confiscation

(b,2) for compensatory damages, the amount to be fixed by the court

(b,3) for costs of suit, attorneys fees, travel expenses and such other relief as the Court deems

just and proper.

Signature: Harold W. Gutch

93057 Regensburg

Isarstrasse 66

Germany