**RECEIVED**

AUG 2 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States District Court
For the District of Columbia

Harold William Gutch
Plaintiff
v.                                         05 CV 02338 (RMU)
Federal Republic of Germany
Defendant

Hereby are transmitted copies certified by US consulate of 4 letters by legal adviser

Headquarters U.S. EUCOM dating 30 N0vermber 1992, 18 February 1993, 23 February 1995 and

20 March 1995.

These letters form proof in complaint 05 – cv- 02338 RMU and are part of the complaint

as enclosures 52-55. As the copies of these letters which were submitted together with complaint

seem not to fulfil the requirements of international certification please attach these properly

certified letters to the corresponding enclosures.

Copies of further evidence material of the complaint certified according to international

regulations will follow as soon as possible.

Respectfully submitted,   21. Aug. 06

*[signature]*

Certificate of Service

I certify that the above Plaintiff's notice concerning copies certified according to international
rules was served by First Class German Mail, postage, postage prepaid, on 21 August 2006.

Harold William Gutch
Isarstrasse 66
93057 Regensburg
Germany

*[signature: Harold Gutch]*




**HEADQUARTERS**
**UNITED STATES EUROPEAN COMMAND**
APO AE 09128-4209

IN REPLY REFER TO

_____ECLA_____                                   30 November 1992

Dr. Ulrike Gutch
Isarstrasse 66
8400  Regensburg

Dear Dr. Gutch,

   Reference is made to your letter of November 18, 1992, requesting answers to questions raised concerning the authority granted by HQ USEUCOM to Mr. Kobre to practice law, the procedure for withdrawal of that authority, and the appointment for an indefinite term.

   Mr. Kobre's authorization to practice law in Berlin which is contained in the letter dated 13 Jun 1951 is a valid document, that is, an official military document.  That document was issued by a person acting on behalf of the Commander, Headquarters, United States European Command (HQ USEUCOM) who was and continues to be the highest military authority in Europe.

   The authorization was to practice law for the duration of the occupation which ended in Berlin a little over two years ago.  It could also have been withdrawn earlier by action taken by the appropriate authority to end it.

   The only appropriate authority who could have ended the authorization would have been either the Commander HQ USEUCOM or a person at a lower military echelon exercising power on the Commander's behalf.

   To the best of our knowledge, the authorization was not terminated prior to the ending of the occupation.

                                        Sincerely,

                                        JAMES A. BURGER
                                        Colonel, USA
                                        Legal Adviser




**HEADQUARTERS**
**UNITED STATES EUROPEAN COMMAND**
APO AE 09128-4209

IN REPLY REFER TO

ECLA                                                18 February 1993

Dr. Ulrike Gutch
Isarstrasse 66
8400  Regensburg

Dear Dr. Gutch,

   Reference is made to your letter of 15 February 1993 requesting answers to further questions raised concerning the authority granted by HQ USEUCOM to M. Kobre to practice law in Berlin.

   The HQ USEUCOM authorization for Mr. Kobre to practice law in Berlin which is contained in the letter dated 13 June 1951 did not constitute either an offering or confirming of a position in any U.S. Forces or U.S. Mission agency.  It was simply an authorization for him to engage in an independent law practice at his own risk.  Mr. Kobre did not receive any salary or financial support from U.S. entities; consequently, he was not an employee of the U.S. Government.  Mr. Kobre was given the status, under the Occupation Regime, as an accredited civilian American Attorney in Occupied Germany.  As such he enjoyed certain benefits, such as commissary and post exchange shopping privileges, medical and dental services, auto registration, etc. These are collectively known as "logistical support."

   The 22 June 1955 letter signed by LTC McLaughlin discusses, solely as a policy matter, the curtailment of these benefits.  It does no more or less.  It did not affect Mr. Kobre's status as an accredited attorney authorized to engage in an independent law practice at his own risk.  Since there was no employment relationship with either the U.S Forces or the U.S. Mission, it did and could not terminate his employment.  This is also the case with respect to the letter of 8 July 1955.

   With regard to these letters, they did not and could not withdraw the authority granted by HQ USEUCOM for Mr. Kobre to practice law since LTC McLaughlin was not dealing with authority to practice law and was not writing the letters on behalf of the Commander, Headquarters, United States European Command.

   Concerning whether these two letters were written by the then U.S.-Sector Commandant in Berlin, General Honnen, and whether he had authority to withdraw the HQ USEUCOM authorization to practice law, several points need to be made here.  In order for these letters to be directive in nature, they would have had to contain, as was done in the 13 June 1951 letter, a "BY COMMAND OF

GENERAL HONNEN" line.  Neither letter contains such a line.
Secondly, assuming for the sake of argument that both letters had
such a line, the right of Mr. Kobre to practice law would not
have been rescinded.  As mentioned above, the letters did not
deal with the right to practice law but only with the right to
receive certain logistical support (benefits or privileges).  The
only way for General Honnen to have ended the right to practice
would have been for him to have acted on behalf of the Commander,
HQ USEUCOM.  This he clearly was not doing.

   I hope that this will clarify any misunderstandings which have
arisen.

                                     Sincerely,

                                     JAMES A. BURGER
                                     Colonel, USA
                                     Legal Adviser




**HEADQUARTERS**
UNITED STATES EUROPEAN COMMAND
UNIT 30400, APO AE 09128

REPLY TO
ATTENTION OF

ECLA

23 Feb 95

Dr. Ulrike Gutch
Isarstrasse 66
93057 Regensburg

Dear Dr. Gutch,

   Reference is made to your letter of 6 February 1995 in which you ask for an affirmation by this office of Mr. Kobre's status on and after 1955.

   This office reaffirms that the status granted in paragraph 1 of the letter dated 13 June 1951 by command of the Commander, Headquarters, United States European Command (HQ USEUCOM) could not be withdrawn by the letters of 22 June and 8 July 1955 and 29 May 1957.

   With reference specifically to the 29 May 1957 letter signed by the Legal Adviser, U.S. Mission, Berlin, the following comments pertain.

   As we mentioned in our letters which you reference, only the military authorities (in this case HQ USEUCOM) could withdraw Mr. Kobre's status. In other words, the U.S. diplomatic authorities did not have jurisdiction over such matters because of the occupation status of Berlin. This point was recognized by the U.S. Government on May 7, 1955, when the occupation ended in West Germany.

   At that time, the U.S. President issued Executive Order 10608 which defined U.S. authority and functions in Germany as a result of the ending of the occupation in West Germany and the continuation of the occupation in Berlin. That Order granted to the Chief of the United States Diplomatic Mission to the Federal Republic of Germany supreme authority, "**except as otherwise provided herein**, with respect to all responsibilities, duties, and governmental functions of the United States in all Germany" (our emphasis). The exception occurs in paragraph 3 of that Order which reads that "the United States Military Commander having area responsibility in Germany ... shall have authority with respect to all military responsibilities, duties and functions of the United States in all Germany, including the command, security, and stationing of United States forces in Germany, the assertion and exercise of their rights and discharge of their obligations therein, and emergency measures which he may consider essential for their protection or the accomplishment of his mission." The Military Commander referred to in that Order is the Commander, HQ USEUCOM, and only that Commander could revoke Mr. Kobre's status. A copy of that Order is enclosed for your information.

   Assume, however, for the sake of argument that the authority to revoke Mr. Kobre's status in Berlin lay with the United States diplomatic authorities rather than the military authorities. The Order is significant with respect to the letter of 29 May 1957, signed by Mr. Grover W. Penberthy, Legal Adviser, U.S. Mission, Berlin. The Order points out that the "supreme authority" in this case is the Chief of the United States Diplomatic Mission to the Federal Republic of Germany. The reference is not to the U.S. Mission in Berlin, but to the U.S. Embassy in Bonn. In other words, the official diplomatic position on Mr. Kobre's status in Berlin would, absent the exception discussed above, have been with the Legal Adviser at the U.S. Embassy in Bonn, Mr. Henry F. Waldstein. As you note in your letter, he has disagreed with Mr. Penberthy and agreed with us.

   In sum, the U.S. Embassy Legal Advisor in Bonn concluded that, at least as of April 24, 1957, Mr. Kobre continued to be a member of the "Allied Forces" as that term is defined in Allied Kommandatura Law No. 2, Article I, paragraph (3) (e), and that it was up to the appropriate military authorities to decide whether to continue such status and to certify such a status. After that date, we have no records which indicate that Mr. Kobre's status.

Encl  
as

RAYMOND C. RUPPERT  
COL, USA  
Legal Advisor



# FEDERAL REGISTER

VOLUME 20  *1934*  NUMBER 90

Washington, Saturday, May 7, 1955

## TITLE 3—THE PRESIDENT

### EXECUTIVE ORDER 10608

UNITED STATES AUTHORITY AND FUNCTIONS IN GERMANY

By virtue of the authority vested in me by the Constitution and the statutes, including the Foreign Service Act of 1946 (60 Stat. 999), as amended, and as President of the United States and Commander in Chief of the armed forces of the United States, it is ordered as follows:

1. Executive Order No. 10062 of June 6, 1949, and Executive Order No. 10144 of July 21, 1950, amending that order, are hereby revoked, and the position of United States High Commissioner for Germany, established by that order, is hereby abolished.

2. The Chief of the United States Diplomatic Mission to the Federal Republic of Germany, hereinafter referred to as the Chief of Mission, shall have supreme authority, except as otherwise provided herein, with respect to all responsibilities, duties, and governmental functions of the United States in all Germany. The Chief of Mission shall exercise his authority under the supervision of the Secretary of State and subject to ultimate direction by the President.

3. The United States Military Commander having area responsibility in Germany, hereinafter referred to as the Commander, shall have authority with respect to all military responsibilities, duties, and functions of the United States in all Germany, including the command, security, and stationing of United States forces in Germany, the assertion and exercise of their rights and discharge of their obligations therein, and emergency measures which he may consider essential for their protection or the accomplishment of his mission. The Commander may delegate the authority conferred upon him. If action by the Commander or any representative of the Commander, pursuant to the authority herein conferred, affects the foreign policy of the United States or involves relations or negotiations with non-military German authorities, such action shall be taken only after consultation with and agreement by the Chief of Mission or pursuant to procedures previously agreed to between the Chief of Mission and the Commander or his representative.

Either the Chief of Mission or the Commander may raise with the other any question which he believes requires such consultation. If agreement is not reached between them, any differences may be referred to the Department of State and the Department of Defense for resolution.

4. The Chief of Mission and the Commander or his designated representatives shall, to the fullest extent consistent with their respective missions, render assistance and support to each other in carrying out the agreements and policies of the United States.

5. With regard to the custody, care, and execution of sentences and disposition (including pardon, clemency, parole, or release) of war criminals confined or hereafter to be confined in Germany as a result of conviction by military tribunals (A) the Chief of Mission shall share the four-power responsibility in the case of persons convicted by the International Military Tribunal, (B) the Chief of Mission shall exercise responsibility in the case of persons convicted by military tribunals established by the United States Military Governor pursuant to Control Council Law No. 10, and (C) the Commander shall exercise responsibility in the case of persons convicted by other military tribunals established by United States Military Commanders in Germany and elsewhere. The Commander shall, on request of the Chief of Mission, take necessary measures for carrying into execution any sentences adjudged against such persons in category (B) as to whom the Chief of Mission has responsibility and control. Transfer of custody of persons in categories (B) and (C) to the Federal Republic of Germany as provided in the Convention on the Settlement of Matters Arising out of the War and Occupation shall terminate the responsibility of the Chief of Mission and the Commander with respect to such persons to the extent that the responsibility of the United States for them is thereupon terminated pursuant to the provisions of the said Convention.

6. If major differences arise over matters affecting the United States Forces in Germany, such differences may be referred to the Department of State and the Department of Defense for resolution.

(Continued on p. 3095)

## CONTENTS

### THE PRESIDENT

Executive Order
United States authority and functions in Germany_____

### EXECUTIVE AGENCIES

Agricultural Marketing Service
Rules and regulations:
  Blueberries, U. S. standards for grades; miscellaneous amendments_____
  Grapefruit, Arizona and California; limitation of shipments_____
  Lemons, California and Arizona; limitation of shipments_____
  Milk, Dayton-Springfield, Ohio; termination of certain provision, Class III milk prices___
  Oranges, Valencia, Arizona and California; limitation of handling_____

Agriculture Department
See Agricultural Marketing Service; Farmers Home Administration.
Notices:
  Arizona and Texas; delineation and certification of certain counties in drought areas___
  Office of General Counsel; delegations of authority_____

Alien Property Office
Notices:
  Kehl, Louise Barbara Richter; vesting order_____

Civil Aeronautics Administration
Rules and regulations:
  Standard instrument approach procedure alterations_____

Civil Aeronautics Board
Notices:
  Prehearing conferences:
    Lineas Aereas Costarricenses, S. A_____
    Pioneer Air Lines; certificate renewal case_____
  Proposed rule making:
    International air freight forwarders; investigation_____
    Rotorcraft airworthiness; transport categories and simplification of requirements for small rotorcraft_____

3093

## CODIFICATION GUIDE—Con.

| | Page |
|---|---|
| Title 36 | |
| Chapter I: | |
| Part 20 | 3098 |
| Title 41 | |
| Chapter II: | |
| Part 202 (proposed) | 3138 |
| Title 45 | |
| Subtitle A: | |
| Part 20 | 3111 |
| Title 46 | |
| Chapter II: | |
| Part 281 | 3098 |

7. This order shall become effective on the date that the Convention on Relations between the Three Powers and the Federal Republic of Germany and related Conventions, as amended, come into force.

DWIGHT D. EISENHOWER

THE WHITE HOUSE,
  May 5, 1955.

[F. R. Doc. 55-3751; Filed, May 5, 1955;
  12:33 p. m.]

# RULES AND REGULATIONS

## TITLE 5—ADMINISTRATIVE PERSONNEL

### Chapter III—Foreign and Territorial Compensation

[Dept. Reg. 108.255]

PART 325—ADDITIONAL COMPENSATION IN FOREIGN AREAS

DESIGNATION OF DIFFERENTIAL POSTS

Section 325.11 *Designation of differential posts* is amended as follows, effective on the dates indicated:

1. Effective as of the beginning of the first pay period following May 7, 1955, paragraph (b) is amended by the deletion of the following posts:

India, all posts except Bangalore, Bhopal, Bokaro, Bombay, Cuddalore, Cuttack, Gwalior, Hazaribagh, Hyderabad, Izatnagar, Kharagpur, Lucknow, Madras, Nabha, Nagpur, New Delhi, Patiala, Patna, Poona, Simla and Trivandrum.

2. Effective as of the beginning of the first pay period following May 7, 1955, paragraph (c) is amended by the deletion of the following post:

Bangalore, India.

3. Effective as of the beginning of the first pay period following May 7, 1955, paragraph (a) is amended by the addition of the following post:

Chandigarh, India.

4. Effective as of the beginning of the first pay period following February 12, 1955, paragraph (b) is amended by the addition of the following post:

Mechra-Bel-Ksiri, Morocco.

5. Effective as of the beginning of the first pay period following May 7, 1955, paragraph (b) is amended by the addition of the following posts:

India, all posts except Bangalore, Bhopal, Bokaro, Bombay, Chandigarh, Cuddalore, Cuttack, Gwalior, Hazaribagh, Hyderabad, Izatnagar, Kharagpur, Lucknow, Madras, Nabha, Nagpur, New Delhi, Patiala, Patna, Poona, Simla, Trivandrum and Vellore.

6. Effective as of the beginning of the first pay period following January 1, 1955, paragraph (d) is amended by the addition of the following post:

La Roche sur Yon, France.

7. Effective as of the beginning of the first pay period following May 7, 1955, paragraph (d) is amended by the addition of the following posts:

Bangalore, India.
Vellore, India.

(Sec. 102, Part I, E. O. 10000, 13 F. R. 5453, 3 CFR, 1948 Supp.)

For the Secretary of State.

LOY W. HENDERSON,
  *Deputy Under Secretary,
  for Administration.*

APRIL 28, 1955.

[F. R. Doc. 55-3706; Filed, May 6, 1955;
  8:45 a. m.]

## TITLE 6—AGRICULTURAL CREDIT

### Chapter III—Farmers Home Administration, Department of Agriculture

Subchapter B—Farm Ownership Loans

PART 311—BASIC REGULATIONS

SUBPART B—LOAN LIMITATIONS

AVERAGE VALUES OF FARMS; MISSOURI

For the purposes of title I of the Bankhead-Jones Farm Tenant Act, as amended, average values of efficient family-type farm-management units for the counties identified below are determined to be as herein set forth. The average values heretofore established for said counties, which appear in the tabulations of average values under § 311.29, Chapter III, Title 6 of the Code of Federal Regulations, are hereby superseded by the average values set forth below for said counties.

MISSOURI

| County: | Average value |
|---|---|
| Adair | $20,000 |
| Andrew | 28,000 |
| Atchison | 28,000 |
| Audrain | 20,000 |
| Barry | 17,000 |
| Barton | 20,000 |
| Bates | 21,000 |
| Benton | 16,000 |
| Bollinger | 16,000 |
| Boone | 20,000 |
| Buchanan | 28,000 |
| Butler | 20,000 |
| Caldwell | 23,000 |
| Callaway | 20,000 |
| Camden | 15,000 |
| Cape Girardeau | 20,000 |
| Carroll | 27,000 |
| Carter | 15,000 |
| Cass | 22,000 |
| Cedar | 18,000 |
| Chariton | 25,000 |

MISSOURI—Continued

| County: | Average value |
|---|---|
| Christian | $17. |
| Clark | 20. |
| Clay | 28. |
| Clinton | 28. |
| Cole | 20. |
| Cooper | 23. |
| Crawford | 16. |
| Dade | 19. |
| Dallas | 15. |
| Daviess | 22. |
| De Kalb | 23. |
| Dent | 15. |
| Douglas | 15. |
| Dunklin | 32. |
| Franklin | 21. |
| Gasconade | 20. |
| Gentry | 23. |
| Greene | 22. |
| Grundy | 21. |
| Harrison | 21. |
| Henry | 21. |
| Hickory | 15. |
| Holt | 28. |
| Howard | 22. |
| Howell | 15. |
| Iron | 15. |
| Jackson | 26. |
| Jasper | 21. |
| Jefferson | 20. |
| Johnson | 22. |
| Knox | 20. |
| Laclede | 15. |
| Lafayette | 28. |
| Lawrence | 20. |
| Lewis | 20 |
| Lincoln | 22 |
| Linn | 20 |
| Livingston | 22 |
| McDonald | 15 |
| Macon | 20 |
| Madison | 15 |
| Maries | 15 |
| Marion | 20 |
| Mercer | 19 |
| Miller | 15 |
| Mississippi | 30 |
| Moniteau | 20 |
| Monroe | 20 |
| Montgomery | 20 |
| Morgan | 17 |
| New Madrid | 32 |
| Newton | 20 |
| Nodaway | 28 |
| Oregon | 15 |
| Osage | 20 |
| Ozark | 15 |
| Pemiscot | 35 |
| Perry | 20 |
| Pettis | 20 |
| Phelps | 15 |
| Pike | 22 |
| Platte | 28 |
| Polk | 20 |
| Pulaski | 15 |
| Putnam | 19 |
| Ralls | 20 |
| Randolph | 20 |
| Ray | 20 |
| Reynolds | 15 |
| Ripley | 17 |
| Saint Charles | 25 |
| Saint Clair | 19 |
| Saint Francois | 15 |
| Sainte Genevieve | 20 |
| Saint Louis | 25 |
| Saline | 28 |
| Schuyler | 20 |
| Scotland | 20 |
| Scott | 30 |
| Shannon | 15 |
| Shelby | 20 |
| Stoddard | 25 |
| Stone | 15 |
| Sullivan | 15 |
| Taney | 15 |
| Texas | 1 |
| Vernon | 2 |




**HEADQUARTERS
UNITED STATES EUROPEAN COMMAND
UNIT 30400, APO AE 09128**

REPLY TO
ATTENTION OF
ECLA

20 Mar 95

Dr. Ulrike Gutch
Isarstrasse 66
93057 Regensburg

Dear Dr. Gutch,

   Reference is made to your letters of 9 February and 2 March 1995 which raise a number of further questions concerning Mr. Kobre's status on and after 1955.

   For the same reasons mentioned in our letter of 23 February 1995, the status granted in paragraph 2 of the letter dated 13 June 1951 by command of the Commander, Headquarters, United States European Command could not be withdrawn by the letters of 22 June and 8 July 1955 and 29 May 1957. It is also correct that the status granted in paragraph 2 of the letter dated 13 June 1951 did not, by its own terms expire in 1955.

   You requested that we looked at Allied Kommandatura Law No 7, Article 3, paragraph 2., and Article 4, paragraph 1., in conjunction with the "Two-Plus-Four" Treaty. Specifically, you ask if the power to decide on Allied matters was passed onto the Germans in that Treaty. You ask further who would decide on such an issue.

   The "Two-Plus-Four" Treaty is a diplomatic agreement which was negotiated by representatives from our State Department rather than by military representatives. Hence, questions about that Treaty should be address to the Legal Advisor's Office at the U.S. State Department. The same is true with respect to questions of interpretation of the Allied Kommandatura Law no 7. You refer in your 2 March 1995 letter to the memorandum dated April 24, 1957 written by the U.S. Embassy, Bonn, Legal Advisor, Mr. Waldstein. He did discuss in that memorandum some pertinent aspects of these issues.

                                    RAYMOND C. RUPPERT
                                    COL, USA
                                    Legal Advisor